R. O. EDWARDS, Administrator of L. F. HENDERSON et al. *v.* A. A. GAULDING et al.

1. PROBATE COURT: PRACTICE: PLEADING: PRELIMINARY ISSUE MUST BE TRIED SEPARATELY: CASE IN JUDGMENT.—If, in a proceeding in the Probate Court, seeking to set aside the probate of a will, the interest or heirship of the petitioners be denied, the question thus raised is preliminary in its character, and should be determined before any trial is had upon the alleged invalidity of the will; and hence, in such a case, it will be error for the Probate Court to order an issue as to the interest of the petitioners, and an issue *devisavit vel non,* to be made up and submitted to the same jury.

2. EVIDENCE: RECORD OF PROBATE IN COMMON FORM NOT ADMISSIBLE.—The record of the probate of a will in common form, being *ex parte,* and made without notice to the heirs, is not admissible in evidence on the part of the executor, on the trial of an issue *devisavit vel non.*

3. STATUTES: CONSTRUCTION: CONSTRUED WITH REFERENCE TO COMMON LAW.— Statutes are to be construed in reference to the principles of the common law; and it is not to be presumed that the legislature intended to make any innovation upon the common law, further than the necessity of the case absolutely required. See 1 Kent Com. (side page), 464.

4. SAME: CASE IN JUDGMENT: BASTARD'S RIGHT TO INHERIT.—The Act of the 23d February, 1846, which provides, that thereafter "all illegitimate children shall inherit the property of their mothers, and from each other, as children of the half-blood, according to the Statutes of Distributions and Descents, now in force in this State," being an innovation of the common law, is to be construed strictly; and it does not, therefore, remove any disability of, or confer any right on, illegitimates, except such as are specially mentioned in the act.

Edwards, Admr. et al. *v.* Gaulding et al.

5. SAME: SAME.—The legitimate children of a bastard who died previous to the passage of the Act of the 23d February, 1846, are not entitled, under the provisions of that act, to inherit the estate of their illegitimate uncle or aunt, dying after the passage of the act.

APPEAL from the Court of Probates of Hinds county. Hon. John H. Robb, judge.

Cecilia Reagan, who was an illegitimate child of Jemima Cotton, died in the year 1852, without issue. The said Jemima also had another illegitimate child, viz., Josiah Horton, who died in the year 1845, leaving the appellees, his legitimate children, surviving him. After the marriage of said Jemima, she had issue, Roderick Rutland, who was living at the death of said Cecilia Reagan, his illegitimate half-sister.

A nuncupative will of the said Cecilia, bequeathing and devising most of her estate, worth about $200,000, to L. F. Henderson, was probated after her death. And this petition was filed by the said Roderick Rutland, the legitimate child of said Jemima Cotton, and half-brother of the said Cecilia, who, as before stated, was an illegitimate, and by the legitimate children of said Josiah Horton, who was an illegitimate brother of said Cecilia, for the purpose of setting aside said probate. The petition attacks the alleged will, upon the ground of mental imbecility in the said Cecilia, and fraud in Henderson, in procuring it to be made, and also on the ground that the alleged act of nuncupation was of itself insufficient.

The answer denied the heirship of the petitioners, and the ground upon which it was sought to invalidate the will.

The petitioners moved the court for an issue *devisavit vel non*, upon the alleged nuncupative will of said Cecilia. The respondents objected to this motion, upon these grounds: 1st. The relationship and interest of petitioners have been denied by the answer, and the question so raised, and which is preliminary to the other, has not been decided, nor does the motion ask for such decision. 2d. The respondents deny the right of petitioners to ask for an investigation of the will, until the heirship of petitioners shall be established.

The court ordered the petitioners to tender an issue, as to their interest and heirship; and ordered the respondents to tender an issue,

as to the validity of the will.  To this the petitioners excepted.  The petitioners thereupon, in obedience to the decree of the court, tendered an issue, alleging, on their part, that they were the heirs and distributees of said Cecilia Reagan, and entitled to litigate the validity of her alleged will; and the respondents, "protesting against being required to litigate with petitioners the matters arising out of said nuncupative will, before their relationship is established by the verdict of a jury," tendered an issue *devisavit vel non.*

On the trial, both parties claimed the right to open and conduct the testimony, and the argument before the jury, on both issues. The court decided in favor of the petitioners, and the respondents excepted.

Upon the trial, the relationship of the petitioners to Cecilia Reagan was established, as above set forth.  The evidence in relation to the other issue is not set out, because no opinion was expressed on that question by this court.  The respondents, however, offered to introduce, as evidence in support of their side of that issue, the probate of the nuncupative will in common form.  This proposed evidence was ruled out by the court, and the respondents excepted.

The court, in charging the jury, ruled that, if Roderick Rutland was a legitimate child of Jemima Cotton, he was, under no circumstances, entitled to distribution in the estate of a deceased illegitimate sister, dying intestate; and that Josiah Horton, being an illegitimate, would be entitled, if alive, to succeed to the estate of his intestate illegitimate sister; and that, being dead, whether he died before or after the passage of the Act of 23d February, 1846, his legitimate children were entitled to the same rights, that he would have had if alive.

The jury found the first issue, in relation to the heirship, in favor of the petitioners, except Roderick Rutland; and on the second, they found against the validity of the will.  The court decreed accordingly, and the respondents appealed.

*Yerger & Rucks,* for appellants.

First. The first error committed by the court, was in ordering the issue *devisavit vel non* to be made up and tried, before it had decided the question of heirship, which was denied by the executors.  When a will is once admitted to probate, its validity cannot

be contested, nor has the court authority to make up an issue to contest it, at the instance of any one but "a person interested." The probate, in common form, being the judgment of a competent tribunal, was intended to protect the rights of legatees, until, in the language of the statute, "a person interested" denied its validity, and filed a petition to contest it. Hutch. Code; Rev. Code, 434, art. 43.

The preliminary question to be settled, before an issue of "will or no will" can be made up, is whether the party asking to have it made up and tried, is a "person interested" in the question. For it surely never was contemplated by the legislature, that a party claiming under a will admitted to probate, should be put to the trouble, vexation, annoyance, and expense of re-trying and establishing its validity, at the false clamor of a party who has established no interest in the controversy, and who, after all the harassments of a trial have been gone through, appears only an intermeddler in a matter of no concernment to him.

The error thus committed by the court, was rendered more obvious by the additional erroneous ruling, requiring both issues to be tried at the same time by the same jury, and by giving to the petitioners the opening and conclusion of the whole case, to the manifest detriment of the executors, and in violation of a fixed and established rule, giving to the claimants under the will the opening and conclusion, as the onus of establishing the will affirmatively, on the issue of "will or no will," is thrown upon them.

The error of the court is made more manifest in these particulars, by the ruling of the court, which excluded from the jury, the judgment of the court admitting the will to probate in common form; thus compelling proof *de novo* of the will affirmatively, as if again propounded for probate, and denying the *prima facie* validity of the order of probate, taken in the first instance.

Second. I think the court erred in excluding the probate of the will in common form, as evidence before the jury. It was the judgment of a court of competent jurisdiction, rendered in accordance with the law, and although the statute gave to a "party interested" the right to contest the validity of the will, in a limited time, I still think the original judgment of probate *prima facie* evidence of the validity of the will, and, therefore, competent evidence

before the jury.   The will having once been propounded and admitted to probate, I think a correct practice should require those who deny its validity, and seek to set it aside, should be required to adduce those facts which tend to impeach it and render it invalid, and not throw the burden of proof, after lapse of time may have rendered it difficult, upon the claimants under the will, who had to make out a *prima facie* case, to entitle the will to probate in common form.

Third.  On the trial of the issue, as to heirship, these facts are established very clearly; and about them there is no doubt, to wit, that Cecilia Reagen died in the year 1852; that she was illegitimate; that Roderick Rutland, one of the petitioners, was her half-brother, the legitimate child of her mother, born after her marriage with a man named Rutland, which marriage was some years after Cecilia's birth.   Secondly.  That Gaulding and the other petitioners, except Roderick Rutland, are the legitimate children and heirs at law of Josiah Horton; and that Josiah Horton was an illegitimate half-brother of Cecilia Reagen, and that he died before she died, in the year 1845, and prior to the 23d February, 1846.

On this state of facts, it is clear that, by the principles of the common law, these petitioners had no interest in the estate of Mrs. Reagen, and could not inherit any part of it as her heirs at law, or distributees, because she, being a bastard by the principles of the common law, could have no heirs but their own offspring.

" Illegitimate children, by the common law, cannot take by descent, for they have not in law inheritable blood.   Nor can they transmit by descent, except to their own offspring, for they have no other heirs."   4 Kent Com. 438, 413.

But while it is conceded that these parties cannot take by virtue of the common law, it is alleged that the provisions of the Act of 23d February, 1846, confer upon them the right of inheritance.

The 4th section of that act, Hutch. Code, declares : " Hereafter all illegitimate children shall inherit the property of their mothers, and from each other, as children of the half-blood, according to the statutes of descent and distribution now in force in this State."

This statute being in derogation of the common law, and conferring rights where none existed before, according to established rules

of construction, should be construed strictly, and cannot be extended to embrace cases which do not fall within its provisions.

Treating only of illegitimates and their rights, it cannot be held to confer rights, or grant powers, to any other class than those embraced within its terms, and covered by its definitions.

In this point of view it is very clear, and the court below so ruled, that Roderick Rutland was not entitled to contest the validity of this will; because, being a legitimate child, the half-brother of Mrs. Reagen, he could not inherit from her by the rules of the common law; nor could he take under the Act of 1846, which only authorizes "illegitimate children to inherit from each other." Embracing inheritance only between illegitimates, and only changing the common law in relation to descents between them, its provisions do not authorize a legitimate brother to inherit from an illegitimate ; nor the converse, an illegitimate brother to inherit from a legitimate.

In Maryland, a statute similar to ours was passed in 1825, declaring that illegitimate children should be able and capable in law, to take and inherit both real and personal estate from their mother, and from each other, or from the descendants of each other, as the case may be, in like manner as if born in lawful wedlock." 1 Dorsey's Laws of Maryland, 835.

In a case arising under this act, the Supreme Court of Maryland declare, that it is expressly restricted to the relation there stated among illegitimates, excluding the legitimates from any participation, and its provisions being in derogation of the common law must be construed strictly : *Miller* v. *Stewart*, 8 Gill. R. 129 ; Maryland Dig. tit. Bastard, 56 ; and in this case, it was held that neither his mother, nor her legitimate children, had any claim to the estate of an illegitimate, under the above act.

In Kentucky, in 1840, an act was passed declaring that the mother should be capable of inheriting from her bastard child ; and that illegitimates, brothers and sisters, born of the same mother, might inherit from each other as children of the whole blood, as if born in wedlock.

In construing this act, the court in Kentucky decided, that a legitimate brother or sister could not inherit from an illegitimate,

though born of the same mother. *Remmington* v. *Lewis*, 8 B. Mon. 606.

In the case of *Flintham* v. *Holder*, 1 Dev. Eq. R. 345, the Supreme Court of North Carolina, giving a construction to their statute, held that legitimates might take from an illegitimate brother, but the decision is put on the fact that the statute does not confine itself to inheritances between illegitimates ; and the court say, if the legislature had intended this, it would have declared that the estates of bastards should descend "to all his illegitimate brothers and sisters born of the same mother." Thus showing that if the words of the act had provided only for inheritance between illegitimates, the same construction would have been given as in Maryland and Kentucky.

The probate judge ruled this point in accordance with the decisions cited herein, on the claim of Roderick Rutland, the legitimate half-brother of the deceased. But his ruling was exactly the reverse, upon the claim made by Gaulding and others, the legitimate nephews and nieces ; the children of Joseph Horton, an illegitimate brother of the deceased.

To my mind, a more palpably erroneous ruling could not have been made. It will be recollected that Joseph Horton, the illegitimate half-brother, died before Mrs. Reagen, and he died, too, before the Act of 23d February, 1846, was passed. When he died, the common law was in force in Mississippi. Being a bastard himself, he had no inheritable blood through which he could claim an estate from any one. And Mrs. Reagen being also a bastard, had no inheritable blood through which she could transmit any estate, to any one except her legitimate offspring. When Joseph Horton died, there was no relationship recognized by law between him and Mrs. Reagen, by which they could inherit from each other.

Subsequent to his death, the Act of 1846, 23d February, was passed, which declared that "illegitimate children might inherit from each other, as children of the half-blood, according to the statutes of descents and distributions."

When the Act of 1846 was passed, authorizing "illegitimate children to inherit from each other," Joseph Horton was dead ; Mrs. Reagen had no illegitimate brother in existence, from whom she could inherit, or who could inherit from her. There was no person

in existence related to her, to whom the act could apply; and I am at a loss to conceive upon what principle of law, a statute conferring inheritable properties upon a class of persons not possessing them before its enactment, can be held to confer it upon persons who died before its passage.; who, in fact, were not; who, as to the performance of any duties, or the acquisition of any rights, were as though they never had been.

Their nephews and nieces are not named in the statute; the statute confines itself to inheritance between illegitimate children. But it is said, illegitimate children are to inherit as children of the half-blood, according to the statutes of descents.

And it is argued, that the children of Joseph Horton take by representation, according to the provisions of the Statute of Descents, providing for descents among brothers and sisters, that "the descendants of a brother or sister of the intestate, are to have in equal parts among them, their deceased parents' share."

But this argument begs the question,—takes for granted the very position denied by us, to wit, that Joseph Horton had any share or interest. When did he acquire it? He did not have it when he lived. He did not have it at his death. At that time he, in contemplation of law, was not related to Mrs. Reagen. He had no right to inherit from her; in law, was a stranger to her; under the law, when he died, he had no capacity to take as her heir. I suppose that this is the first instance in the world, in which it was ever contended that a law, made to regulate the rights, duties, powers, and capacities of the living, could possibly confer powers and capacities to the dead,—could confer upon nonentity the powers and rights of a sentient being, and, by some mysterious process of legislation, could galvanize a dead body into life, so far as to give to him legal powers and capacities which he did not possess. Such a doctrine, while at war with common sense, is opposed to all the analogies of our law.

A judgment of a court of record, though rendered by name in favor of a dead man, is an absolute nullity, and cannot be enforced, and confers rights upon no one. A forthcoming bond, made payable to a deceased plaintiff, is an absolute nullity. So too, a devise to a dead man is an absolute nullity, and void *ab initio*. So too, a patent for land to a deceased person, is void, and conveys no title.

In fact, it is a universal principle of the common law, that every act done in the name of a deceased party is void.

But the present case is much stronger. It does not purport to confer rights on the deceased. It is only an act of ordinary legislation, to be construed as ordinary acts of legislation, and therefore only acting upon and giving rights to the living.

As then Joseph Horton was dead, when this law was passed; as at the time of his decease he had no rights, which he could transmit to his children, in the estate of his illegitimate sister, Mrs. Reagen, either by the provisions of the law or by contract, these petitioners, his children, cannot claim by representation, by, through, or under him; because, at the time of his decease, he did not have any interest in the estate, or capacity to inherit, either in possession, in remainder, in reversion, in expectancy, actual, vested, or contingent. In short, he had no rights of any kind, present or prospective, nor any power, present or prospective, in the premises, and therefore had nothing which those parties could take as representing him. This proposition, to my mind, seems so obvious, that I am at a loss how to argue it. To me, it has much the appearance of attempting to prove the truth of an axiom, by argument.

According to the principles of the common law, to entitle a party to take an inheritance as heir, the ancestor, under whom he claims, must have had actual seisin, or seisin in deed. This rule was so far relaxed by the courts in England and this country, that seisin in law was held to be all that was necessary to enable the heirs to take by descent. 4 Kent's Comm. 386, 406, note b; Ib. 387, 408, note a.

It is also a well-settled rule of the common law, that if the person owning the remainder or reversion, expectant upon the determination of the freehold estate, dies during the continuance of the particular estate, the remainder or reversion does not descend to his heir, because he never had a seisin, to render him the stock or *terminus* of an inheritance. The intervention of the estate of freehold, between the possession and the absolute fee, prevents the owner of the fee from becoming the stock of inheritance, if he dies during the continuance of the life estate. 4 Kent's Comm. 408.

But in the present case, the children of Joseph Horton claim to take an estate through him as his heirs at law, although Joseph Hor-

ton never had seisin of it in fact or in law, actual or constructive, in which at the time of his death he had no interest, present or future, expectant or contingent. To which, by the law of the land, at the time of his death, he had no claim. To take which, he had no capacity, and in which he had by law, no right or interest of any kind whatever, remote, contingent, expectant, or possible, and by the law of the land; could not have any.

If these parties claim at all, it must be by direct force of the statute, and not by virtue of that provision of the law of descents, which enables a child to take his deceased parent's share of an estate, because at the time of Joseph Horton's decease, he had no right or capacity of inheritance to transmit to his children.

The case of *Stevenson's Heirs* v. *Sullivant*, 5 Wheaton's R. 207, S. C. Curtis R. 618, is in some of its features like the present, and the principles there laid down, establish the rule very clearly against the petitioners in this case. See also the case of *Scroggin* v. *Allan*, decided by the Supreme Court of Kentucky, 2 Dana R. 363.

The words of the Act of 1846 are, "Hereafter, illegitimate children may inherit," &c. These words can confer no right upon these petitioners, because they are not illegitimate, and therefore they do not take directly by force of the statute, nor, as I have before shown, can they take as representing their father, because at the time of his death, he had no capacity or possibility of inheritance, nor can it be held to confer a right of inheritance on him, by words which declare that "hereafter illegitimate children may inherit," &c., when he was not in existence, and of course could not take any capacity or right, upon any known principle of law, or common sense. Descent, or hereditary possession, is the title by which on the death of his ancestor, a party acquires his estate, by right of representation, as his heir. 4 Kent. Comm. 374, 394.

But where the ancestor, or other through whom the inheritance must be claimed, did not have inheritable blood, there can be no title acquired by representation. 2 Kent Comm. 15, 54.

An illustration of this rule is found in the following case, arising under the naturalization laws. If A. die intestate without issue, and leave a brother who had been naturalized, and also a nephew who had been naturalized, but whose father died an alien, the brother succeeds to the whole estate, for the nephew by the common

law, is not permitted to trace his descent through an alien father. *McCartey* v. *Levi*, 6 Peters R. 102; *Jackson* v. *Green*, 7 Wendell, 333; *Same* v. *Fitzsimmons*, 10 Ib. 11.

These and other cases, particularly that of *Collingwood* v. *Pace*, declare that among collaterals, except in the case of brothers, between whom the descent is declared to be direct and immediate, all descents are mediate, and wherever in tracing title, a party is compelled to claim through a party who did not have inheritable blood, he could not take by representation. And the principle in the case of lineal descents has been announced, that a grandson could not inherit from a grandfather, though both were natural born subjects, if the intermediate father was an alien. *Banks* v. *Walker*, 3 Barb. Ch. R. 438; *McGregor* v. *Comstock*, 3 Comstock R. 408.

But the principle of these cases only seems to bear remotely on this case, which in its facts is *sui generis*, and entirely unlike any I have been able to find, in its main features. For in this case, as the court will particularly observe, the intestate herself was illegitimate, and therefore entirely without inheritable blood, or capable of transmitting, except to her own offspring. Secondly, Joseph Horton, under whom petitioners claim, was illegitimate, and incapable of inheritance, and that he died prior to the Act of 1846, without the capacity of inheritance, who did not have a possibility of inheritance, or an expectancy in the estate of Mrs. Reagen. On his death, which was the period at which these petitioners succeeded to his rights, he therefore had nothing in which he could be represented by them in the estate of Mrs. Reagen, she being to him in the eye of the law, a total stranger, to whose property he had not the remotest particle of claim, and to which he never could have, by the laws then in force, than he had, or could have, in the property and estate of all the other millions of beings in the world.

But it is said this statute gives inheritable blood, or communicates inheritable qualities to the blood. This far, and no farther, is this proposition true: that is to say, the persons whom the statute has named have the capacity of inheritance given to them, to the extent of the statute and no farther. It is a statute passed in reference to a particular class, to wit, " illegitimates." The general law had already made provision for legitimates. The subject of legislation being " illegitimates," we must look to the act to see how far it has

changed the common law as to them. It does not purport to confer upon them the general rights of inheritance as they are possessed by legitimates. It is specific and particular as to whom, and from whom, they may take property by inheritance. "Illegitimate children may inherit the property of their mother, and from each other." They are not authorized to inherit from their father, nor from any other legitimate relation; nor is the father, or the mother, or any other legitimate relation, authorized to inherit from them. As far as the statute has conferred the right of inheritance upon them, they are, in the language of the court in *Stevenson's Heirs* v. *Sullivant*,—" *quasi* legitimate, but in all other respects they are bastards." 5 Wheaton, 261. The petitioners in this case are all legitimate; they are not in the words of the act, nor are they in its purview, which embraced only "illegitimates," and legislated exclusively in relation to them. I do not feel called upon either to admit or to deny, that the children of Joseph Horton might have inherited through him, under the Act of 1846, if he had been alive when it was passed, although he might have died before Mrs. Reagen; but I feel confident that human ingenuity cannot work out the problem, by which they can take property as his representatives, to which, by the laws in force at his decease, and when all his rights descended and vested in these petitioners, he had no claim, and no capacity even, to take.

*Johnston* and *Shelton*, on same side,

Cited 1 Black's Comm. 459; 2 Kent's Comm. 212; *Stevenson's Heirs* v. *Sullivant*, 5 Wheat. 207; *Flintham* v. *Holden*, 1 Dev. Eq. R. 345.

*George L. Potter*, for appellees.

The main question upon the issue of heirship involves the true construction of the Act of 1846, which is in these words:

" Hereafter all illegitimate children shall inherit the property of their mothers, and from each other as children of the half blood, according to the Statutes of Descent and Distribution now in force in this State." Hutch. Code, 501, art. 2.

The question is, whether the legitimate children of Josiah Horton are entitled to the share to which he would have been entitled if

living.   On this point, I refer to the argument of Mr. Shelton as a conclusive demonstration of their rights.

It is to be noted that, prior to the passage of this act, our general Statute of Descent and Distribution was in force, by which the rules of the common law were abrogated.   It provided against almost every case of escheat at common law ; admitted all branches of relations, according to degree, without regard to the question whether they were of the blood of the first taker ; and, to avoid an escheat, gave the estate, on failure of heirs, to the surviving husband and wife.   Hutch. Code, 623–4.   In such case the husband or wife inherited,—took as heir.   .

The Act of 1846 is, obviously, but an amendment of the general statutes before existing, and was intended to amend the law of descent and distribution, yet further, so as to provide for the case of illegitimates.   This is manifestly the case, if we consider the object of the Act of 1846.   It relates to descents and distribution, and is necessarily an amendment of the general laws on that subject, as well as of the law of escheat.   Moreover, special reference is made in it to the general laws.   Such children " shall inherit" " from each other as the children of the half blood, according to the Statute of Descent and Distribution now in force."

As was said of a similar statute : " This act must be taken in connection with the previous laws regulating the descent of real estate and the distribution of personal property; for this law forms a part of the entire system of legislation on these subjects." *Brewer* v. *Blougher*, 14 Peters, 199.

Looking to the previous law, we find provision made for children of the decedent, and for the descendants of his deceased children, and provision for the descendants of deceased brothers and sisters. The descendant of a brother or sister who would have taken, if living, are to have " their deceased parents' share." Hutch. Code, 623, § 50.   Thus, by the general law, full provision was made for legitimate children in all cases.   They took the estate of their parent ; and if he had died before the death of the owner of the estate to be divided, they took such share as their parent would have been entitled to if living.

Now take the case of these children of Josiah Horton.   They are legitimate ; and, as such, are entitled, under the general law, to

the estate of their deceased father, and to such share of the estate of Mrs. Reagen as he would have been entitled to if he had survived her. Such are the express provisions of the Act of 1821. Hutch. Code, 623.

If Mrs. Reagen had died before the Act of 1846, these children would have been excluded from her estate only for one reason: they could show their legal relationship to Josiah Horton, but could not show a legal relationship between him and Mrs Reagen; and for that reason would have failed to show they were her next of kin.

At common law, the children of a bastard could inherit from him, but not through him. As to inheritances, he had no father or mother, brother or sister—no such relations, and therefore no inheritable blood. That was the defect. The children of the bastard could not trace back beyond him, because he had no preceding relations. But so far as he could have legal kindred, they were the relations of his children.

Now we say the Act of 1846 changed, to a certain extent, this old rule. The law now recognizes Mima Cotton to have been the mother of Josiah Horton, and he may inherit from her as son. He is in law her son and heir for all purposes of inheritance from her. So of all the illegitimate children of Mima Cotton, for the purpose of inheritance from her, they stand in law as her children, and they stand in law as brother and sister for all purposes of inheritance from each other.

Since the Act of 1846, it can be no longer said that Josiah Horton was not, for all purposes of inheritance from her, the brother of Mrs. Reagen. As was said of a similar statute, " This act recognizes the consanguinity between bastards." 8 B. Monroe, 607, 608, 610; 5 Wheat. 261; *Coor* v. *Starling*, 1 Jones Eq. (N. C.), 246.

It is manifest, therefore, that the old feudal objection no longer applies. It cannot now be said that Horton had no mother, no sister, no inheritable blood. Although a bastard, after the Act of 1846, he had, because of blood relationship, full capacity to inherit from both mother and sister. The old feudal rule was thus to that extent abrogated. When, therefore, his legitimate children claim kin to Mrs. Reagen, they find the Statute of 1846 has removed the only bar, and they see in their father's sister their own blood relation and aunt. They claim like any other claimants. Claim be-

cause they are the children of Horton, who was the brother of Mrs. Reagen.  The chain is complete, and therefore they can inherit.

We take the two acts together.  By the Act of 1846, Horton acquired a legal status of relationship, and would inherit from Mrs. Reagen if he had survived her; and by the general act his children take their deceased parent's share.  They take as next of kin by virtue of the natural relationship, which is recognized by the statute as a legal relationship.

In this view of the case, the appellees are entitled even upon a rigid construction of the act, which has removed the only bar that could ever have been interposed against them.

The following rules of construction apply to and confirm the foregoing views.

" All acts in *pari materia* (relating to descents and distribution) are to be taken together, as if they were one law."  9 Bac. Abridg. 243, tit. Statute, I, 3.  See also examples there given in illustration of the rule, and *Scott* v. *Searles*, 1 S. & M. 591.

Under this rule, we put the Act of 1846 into the Act of 1821, and construe them together, as was done in the case cited from 14 Peters Rep. 199.

" A statute lately made may be holden to be within the equity of a statute made long since."  Ib.

" If a thing contained in a subsequent statute be within the reason of a former statute, it shall be taken to be within the meaning of that statute."  Ib. 244.  See also cases cited there to illustrate the rule.

One of these is a case where a later statute was construed as if a former act had been recited in it.  Just as we insist here that the Act of 1821 being specially referred to, its provisions are to be regarded as if inserted in the Act of 1846.  See also *United States* v. *Freeman*, 3 How. (U. S.) 564.

If it was good policy, as shown by the Act of 1821, that the children of a legitimate should take their deceased parent's share, the same reasons apply in favor of an illegitimate, and his children shall take the share he might claim if living.  Their case is, emphatically, within the " reason" and " equity" of the Act of 1821.

But there are other reasons equally conclusive against the appellants.

As shown by Mr. Shelton, they insist on a rule which gives no effect to that part of the statute which declares such children shall inherit from each other " as children of the half blood," which necessarily leaves the legitimate children of the bastard entitled to take in preference to his brothers and sisters. There was a reason, as the court is bound to say, for the use of these words, and a strong reason is shown in the fact that the bastard might have legitimate children, who should inherit his estate.

· The settled rule is, that " A statute ought to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." 9 Bac. Abridg. 239, 240, tit. Statute, I, 2; 22 Pick. 573 ; *James* v. *Dubois,* 1 Harr. 285; *Hutchens* v. *Niblo,* 4.Blackf. 148.

The court is therefore constrained to give such a construction to the act, if possible, as to give effect to the words, " as children of the half blood ;" and no such construction can be adopted without letting in the children of the deceased bastard in preference to his brothers and sisters. Under the same rule, no bastard brother of Horton and Mrs. Reagen could take her whole estate to the exclusion of Horton's children. The general statute would be applied, and their proper shares allotted to such surviving brother, and to these children.

The same result follows, in another view of the case.

The manifest policy of the Act of 1846, was to amend still further the law of descent and distribution, and to provide against escheats.

A class had been pretermitted, by the previous legislation, and it was deemed just to provide for it. A rule existed, barring certain parties for want of inheritable blood, and it was deemed just to modify that rule. If the legislature permitted the bastard to inherit, there was an obvious necessity to permit his legitimate children to inherit through him. Such was the then existing general policy, as to all legitimate children. If the legislature, to avoid an escheat, would permit a bastard to inherit, much more would they desire to admit his legitimate children. The common law never did exclude lawful children from the estate their father would have taken if he had lived, and it is impossible to conceive a reason why the legislature, in such an enactment, should pass over the legiti-

mate children of a bastard,—as was said by the court of North Carolina, "Our law leans against escheats; a refinement even would be allowed that led to an heir." *Flintham* v. *Holder*, 1 Dev. Eq. 347.

In the construction of a statute, we are to look to the law existing at its enactment, the existing mischief, the remedy, and the reason for it.   9 Bac. Abridg. 245, I, 4.

The mischief here was, that estates became vacant and escheated for want of a legal owner.   This was the feudal vice of base blood; that was the evil, and the manifest intent was to correct that mischief.   By our construction, the intent of the legislature is effected; but our adversaries would establish a rule, which will not only defeat that intent, but abolish a settled rule of the previous law,— that the legitimate child shall take whatever his deceased father would, if living, have been entitled to.

The legislature has declared the intent, that a bastard, in a given case, shall inherit.   We say, the case of his legitimate children is' within that intent.   If he can inherit, his death shall not prevent the descent to them; and we refer to the previous law to prove our position.   If we look to the policy to avoid escheats, and find that, to avoid an escheat, the case of the bastard father is provided for, we must say, in view of the general statute and from the very nature of the case, that the case of his legitimate children is within the intent and policy of the Act of 1846.

"A thing which is within the intention of the makers of a statute, is as much within the statute as if it were within the letter." 9 Bacon Abridg. 245, tit. Statute, I, 5.

As where a statute provided that the right of a person within the age of twenty-one years, at the time of levying a fine, should not be thereby barred; yet, if the disseisee die, leaving a wife with child, and the disseisor levy a fine, and afterwards the child is born, this child, though not within the letter of the statute, is within the meaning, and his right shall be saved.   See also the next case there cited.   Ib.

"By an equitable construction, a case not within the letter of a statute is sometimes holden to be within the meaning, because it is within the mischief for which a remedy is provided." Bac. Abridg. 248, I, 6.

" Thus the statute giving a remedy against executors has always been extended, by equitable construction, to administrators, because they are within the equity of the statute." Ib. 249.

Statutes are not to be construed according to technical rules, unless such was the apparent meaning of the legislature. There-fore many cases, not expressly named, may be comprehended within the equity of a statute ; the letter of which may be enlarged or re-strained, according to the intent of the makers of the law. *Whit-ney* v. *Whitney*, 14 Mass. 92–3.

" Remedial laws are to be so construed as to suppress the mischief intended to be remedied. In construing such statutes, the enacting words may be extended beyond their natural import and effect, in order to include cases within the same mischief." Bac. Abridg. 251–2, I, 8.

These rules apply to the argument of Mr. Shelton, that the term " children" is not to be used in a restricted sense; but such a construction is to be given as will effect the intent and remedy the mischief. They also confirm our proposition, based upon the Acts of 1846 and 1821, that, by force of the latter act, the children shall take whatever their deceased father might have claimed, if living, under the Act of 1846.

These rules also apply, with a conclusive force, against another objection raised by the appellants, that appellees cannot claim under the Act of 1846, because Josiah Horton died before it was enacted. If we are right in our view that the children of a bastard may claim under that statute,—if appellees might claim, if Horton had lived until it was enacted, these authorities are conclusive in their favor, as the case now stands. It is a case within the reason of the act; it is a mischief intended to be remedied. In one case cited we have seen how a statute was extended to the case of a person not in being, in order to save from the bar of a fine levied.

But there are other conclusive reasons against this objection. The purpose of the statute was to remove, in the particular case, the feudal bar of noninheritable blood; and to declare that, as between bastards and their heirs, there should exist full capacity to inherit. The act declares that this old plea of bastardy shall in future be no bar. In this view, it is wholly immaterial whether Horton died before or after the Act of 1846. When that act

·passed, Mrs. Reagen was alive, and no one was her heir. She lived until 1852, and then the descent was cast. It is wholly immaterial whether Horton died in 1845 or 1847, before or after the statute. No rights to this estate accrued to any one at his death, for Mrs. Reagen then owned it. The question of heirship arose only upon her death, in 1852, and the law, as it stood at that date, must control the descent and distribution of her property. So long as Horton died before Mrs. Reagen, it is wholly immaterial whether he died before or after the Act of 1846. She was alive, and he had no right to, or interest in, her estate, and could have had none, if he were legitimate,—*nemo est hæres viventis.* If he had been legitimate, or had died in 1847, after the passage of the act, he would have died without any interest whatever in this property, and that simply because it belonged to Mrs. Reagen. If the question of bastardy had never existed,—if this was a case affecting legitimates only, the appellees would not· found their claim at all upon the idea that Horton had any interest in this estate at his death. When they come claiming, under the Act of 1821, "their deceased parent's share," they do not claim any share he owned at his death, for he had none; but they claim the share that he would have been entitled to, if he had survived Mrs. Reagen. These words of the statute can have no other construction. When Mrs. Reagen died, the question arose, who is entitled to her estate? And the response of law was, that, as Horton would have been entitled if he had survived her, so his children are entitled, he being dead. In such a case, as Blackstone says, the children "represent their ancestor; that is, shall stand in the same place as the person himself would have done if living." 2 Bl. Com. 174 (217). See also Hale's Hist. Com. Law, ch. 11, 237–8.

We therefore insist that, even upon a rigid construction, this objection must be disregarded; but the court, in furtherance of the legislative intent, will give a liberal construction to the statute. In Virginia, there was a statute which took effect in 1787. It provided that, " where a man, having by a woman one or more children, shall afterwards intermarry such woman, such child or children, if recognized by him, shall be thereby legitimated." It also provided, that the issue of marriages deemed null in law should be legitimate. See the words of the law, cited in note to *Rice* v. *Efford,* 3 Hen. & Munf. 227.

Under this statute, a question arose upon a devise to H., " during his natural life and no longer ; and after to his eldest son, and his heirs for ever." H. had no legitimate son. In 1776, he had a bastard son; in 1778, he married the mother, and recognized the child until his death in 1796. Here it will be seen that the statute was in terms prospective, and that the son was born, and the marriage had, before the act took effect. Yet it was held that he was thereby legitimated, and so entitled, as son, under the devise. *Sleighs* v. *Strider*, 3 Hen. & Munf. 229, n. See also *Rice* v. *Efford*, Ib. 225. See *Ash* v. *Way*, where a bastard had issue, and died before his parents married; and it was held, under this act, that his child could claim through him. 2 Gratt. 203.

Upon the other clause of the same statute a question arose. Two daughters, issue of a void marriage, were born before this act took effect, but their father died afterward. They claimed to inherit as his legitimate heirs, by force of the act, and it was held they were entitled. The court said : " The act relates to the disposition of property only, and proceeds to show who shall be admitted to share the property of a person dying intestate, notwithstanding any former legal bar to a succession thereto ; and, in that light, the law ought to receive the most liberal construction." *Stones* v. *Keeling*, 3 Hen. & Munf. 228, n.

These cases apply with equal force to both points upon the statute. Such laws are remedial, and must receive " the most liberal construction." It is vain to say the Act of 1846 is in derogation of the common law, or that it must be construed strictly. It is an amendment of the general statute regulating descents and distribution. It is a remedial law, and must receive a beneficent construction. Our general statute, regulating descents, is, emphatically, an act abrogating common law rules; and there is still greater cause to insist, that, for that reason, it should be strictly construed ; but it would be idle to make such a claim.

Against this objection, founded on the death of Horton before the Act of 1846, this further suggestion is also conclusive. The term " children," as used in the act, is not to be understood in any narrow or restricted sense; but is to be taken in a broad, liberal spirit, as shown by Mr. Shelton. If this view be correct, it is of course immaterial when Horton died. For the rule of construction

of statutes in cases like this, see *Ash* v. *Way*, 2 Gratt. 263; *Garland* v. *Harrison*, 8 Leigh. 368; *Jackson* v. *Sanders*, 2 Ib. 109.

Upon the special exceptions taken during the trial little need be said.

The court properly refused to permit appellants to open and conclude the case, upon the proofs and by argument.

The appellees were the plaintiffs in the petition. They claimed as heirs and distributees, and their right of heirship was contested, an issue was formed to try that question, and they were compelled to make proof upon it. Clearly, they held the affirmative of that issue; and it was the first issue.

The rule is, that " where there is a necessity for any proof, on the part of the plaintiff, he ought to begin." *Comstock* v. *Hadlyme*, 8 Conn. 261, and cases cited.

Where there are several issues, and plaintiff must prove one of them, he is entitled to begin. *Jackson* v. *Hesketh*, 2 Stark. Rep. 456.

But it is immaterial to this point. It was a matter within the discretion of the court, and cannot be assigned for error. 8 Conn. 261.

It may be urged here, that the two issues ought to have been tried separately, as the appellants insisted in the Probate Court. We say the matter is not so reserved that this court can notice it; but, if it was, the objection could not prevail.

There is no more reason why these issues should be tried separately, than exists in every case where two or more issues are presented. In many cases there is a variety of issues, and all are tried by one jury. Perhaps it was never before suggested that a case should be thus dealt out, by parcels, to different juries. If this had been a written will, and these heirs had sued the devisee for the lands of Mrs. Reagen, these two questions involved in these issues must have been tried under the English practice in the action of ejectment. There, the ecclesiastical court could not establish a devise of lands; the devisee must prove the will in the ejectment suit. If these heirs, under that practice, had sued for the lands, and Henderson had set up a written will, the plaintiffs would have been compelled to prove heirship; the defendant would have set up the will; and thus there would be for trial, before one jury, every

question that might arise upon pedigree and upon a will; but no one would insist in such a case upon separate trials of those questions.

If, however, these issues ought properly to have been tried separately, the matter was within the discretion of the judge, and this court cannot interfere.

Exception was taken to the exclusion of the answer to the second cross-interrogatory in deposition of Eliza Aulford. It may be found at page 156. It relates to the statement of Mrs. Horn, made after this suit was brought. She is not shown to be dead, nor related to the family. It is enough to say it was made *post litem motam.*

So as to exclusion of answer to third cross-interrogatory in deposition of Eaton Upchurch, as to who was the reputed father of Mrs. Reagen. It was immaterial. It gives the statement of an aunt, but does not show it was before this controversy arose, nor that she is dead. Besides, you cannot prove, by family repute, who was "reputed father." The statement as to common report was clearly incompetent.

As to exclusion of Phillips's evidence as to what Henderson said were his reasons for taking the keys from Miss Johnson: such statement of motives, made in her absence, was obviously inadmissible. The material fact was his interference with the household of Mrs. Reagen, after the date of the will, and before her death, and his taking charge of her keys. His subsequent explanation of his conduct was immaterial. It won't do to allow men time to bring in excuses.

A statement of Phillips was excluded, and exception taken. He had stated how Henderson had requested him to speak to Mrs. Reagen on the subject of her will. He then volunteered a comment on his evidence, saying he " did not wish it to be inferred from what he had said, that Henderson made it a matter of business to speak to her on the subject." This was properly excluded, as it was for the jury to draw all proper " inferences" from the facts stated by the witness; and when he has stated two or three such requests made by Henderson about the will, the witness was going too far in begging the jury not to draw such an inference. All that appellants could ask, in the way of explanation, was the next statement of the witness, that the request " followed incidentally from a conversation," &c.

John Shelton was asked " if he knew what had become" of a memorandum. He replied that he did not. This was full response to the question; but he volunteered to say he " had no doubt" it was destroyed. This speculation of the witness was properly excluded; but the matter is immaterial, for Hulme afterwards proved that this memorandum was destroyed, and there was no controversy on the point.

Appellants also excepted to the exclusion of the original affidavit of Rhodes & Hulme, for the probate of the will. This was properly rejected. It was like any *ex parte* affidavit, incompetent. There was no excuse for its introduction. The deposition of Rhodes was on file, and Hulme was present to testify. All that part of it giving the words of the alleged will was, however, admitted. So, also, the decree of probate was excluded. It was *ex parte* and inadmissible. It was irrelevant, also, to the issue. The old code admitted such affidavits, but not the decree. This provision is not retained in the new code, and neither is admissible. Moreover, the issue itself and all the proceedings were founded on the fact that the alleged will had been probated. It is so stated in both petition and answer, and was not involved in the issue.

Hulme was asked what was " the nature or character of the feelings of Mrs. Hughes towards Dr. Henderson." He proceeds to say that after the will, she came " to my (his) house, and said,"— we objected to any proof of her statements, and the objection was sustained under a familiar rule. 1 Greenl. Ev. § 462.

Moreover, giving her statements was not a proper response to the question. Counsel stated that their object was to show her hostility to Henderson; but this same witness afterward stated that Miss Johnson (Mrs. Hughes) was hostile to Henderson, when at the house of witness, about two weeks after the will, and so continued to be. Thus, by the same witness, they obtained the proof they sought.

At page 234, it is shown that two questions asked Hulme on re-examination, were excluded, though probably no exception was reserved. If reserved, it is plain the decision was correct. He was the witness of appellants; they examined him and re-cross-examined. On re-examination, they proposed these questions, which were not to any matter of the cross-examination. They attempted to open

up the whole examination again, and to go into new matter on re-examination, which was properly refused. Their first question was also improper. It was whether there was any and what difference between two papers. The proper mode was to require witness to state the contents of each, and leave the jury to determine upon the variance, if any. As to the second, the witness had already stated that the memorandum was made at the request of Mrs. Reagen, and had professed to give all she had said during the making of the will. It was, therefore, idle to ask for his conjectures as to the purpose of deceased in having the memorandum made.

The court very properly restricted counsel to the rule as to re-examinations, and there is no error.

*D. Shelton*, on same side.

The Act of the 23d of February, 1846, is in these words : " Hereafter all illegitimate children shall inherit the property of their mothers, and from each other, as children of the half blood, according to the Statutes of Descent and Distribution now in force in this State." Hutch. Code, p. 501, 84. The Statutes of Descent and Distribution referred to in the said act, so far as they are pertinent to the present case, are as follows : " Where any person shall die seised of any estate, &c., not devised, the same shall descend to his or her children and their descendants in equal parts, the descendants of a deceased child to take the share of the deceased parent in equal parts among them ; and when there shall be no children of the intestate nor descendants of such children, then to the brothers and sisters of the intestate and their descendants, in equal parts, the descendants of a brother or sister of the intestate to have in equal parts among them their deceased parent's share," "and there shall in no case be a distinction between kindred of the whole and half blood, except the kindred of the whole blood in equal degrees shall be preferred to the kindred of the half blood in the same degree." Hutch. Code, p. 623, 530.

" When any person shall die possessed of personal estate not bequeathed, the same shall descend to and be distributed among his or her heirs in the same manner as real estate not devised descends by this act." Hutch. Code, p. 624, 552.

I know that by the common law a bastard had no inheritable

blood, and therefore could not inherit himself nor transmit inheritance, and that only his lineal descendants could inherit from him. I know that these disabilities still continue in this State, except so far as they have been removed or modified by statutory regulations. Hence the whole question of heirship in this case turns on the construction of the foregoing statutes, or rather upon the construction of the Act of 1846 in conjunction with the other acts above quoted. But I contend that in construing that act we are not to give it a rigid construction but a liberal one.

Previous to the passage of the Act of 1846, the property of a mother having only illegitimate children, and the property of a bastard who had no lineal descendants, escheated to the State. That act was passed giving to bastards as a class the right of inheritance to the exclusion of the escheat, in all cases coming within its meaning and effect; it conferred new rights upon them as a class, adverse to the escheat. Such statutes are in the most liberal sense remedial statutes, and not penal. 12 Geo. R. 104.

In construing such statutes the court will be governed by a liberality of construction commensurate with the liberal purpose and object of the legislature in waiving the escheat and granting the right of inheritance. This idea has been forcibly and well expressed by the court of North Carolina. Commenting on a statute in some respects similar to ours, and passed for the same purpose, that court says : " It is to be premised, however, that even a refinement would be allowable that led to an heir and prevented property from being derelict. Our law leans against escheats. Halfbloods are admitted, parents inherit from children, widows from their husbands, bastards from mothers and from each other." 1 Dev. Eq. R. 347.

These comments on the North Carolina statutes are equally applicable to the statutes of Mississippi. It is no part of Mississippi policy to create escheats. Her laws lean against them. Hence she too admits halfbloods, parents, widows, and bastards to inherit, and therefore if refinement is to be used in constuing her statutes on these subjects, it should be for the purpose of leading to an heir, not for the purpose of defeating the inheritance; it should be for the purpose of preventing an escheat, and not for the purpose of securing one.

Where a right of the citizen may be taken away by a statute,

the court will give a rigid construction to save the right; where a right is given by a statute, the court will give it a liberal construction to secure that right; where an object is apparent on the face of the statute, it will construe liberally to effect that object. 1 Bald. C. C. R. 316; 3 M. & S. 105.

This rule is carried so far that in remedial statutes the language is sometimes enlarged, for the purpose of more effectually securing the beneficial effects intended. 1 Kent, 465.

With these principles before us, let us examine the statute in question. It is a most familiar rule of construction, that a statute is to be so construed, as to give meaning and effect to every clause and every word thereof.

The word children used in the statute, in its primary sense, no more means descendants of the first generation than it does descendants of the second and third generations; primarily it means neither the one nor the other: it simply means young persons; that word has no generative sense like the words issue, descendants, &c.; no filiative sense like the words son, daughter, &c., but only a descriptive sense, like the words boy, girl, &c.; we constantly use the word in this, its proper meaning, as antithetical to adults. Thus we speak of things that transpired when we were children: it does not mean when we were sons, for we are those still. Derivative words serve more perfectly to expound the primary meaning of an original word than it can be done in any other manner. It is seldom that words are compounded on a secondary meaning; they usually give the original word its primary signification; hence, when we say childlike, we do not mean like a son or daughter, like a descendant or issue, but we mean like a young person; when we say childish, we do not mean having the character of a son, daughter, descendant, or issue, but we mean having the character of a young member of mankind. When we speak of childhood, we do not mean in the condition of a son or daughter, descendant or issue, but we mean in the condition of a beginner of human life. All men and women are sons and daughters, but they are not children. The truth is that both our adversaries and ourselves construe the word children by a cognate or secondary sense, as meaning descendants; they construe it as meaning only descendants of the first generation, we as meaning descendants generally. It is properly used in

either sense.  The sense for which I contend is supported by as high authority as is that which they maintain.  The Bible constantly uses the word in the sense for which I contend.  The expressions, " the children of Israel," " the children of Ammon," " the children of Abraham," " the children of Ham," " the children of Ishmael," are all expressions in which that word is used in the sense for which I argue.  Our adversaries, therefore, take nothing by any argument predicated on the literal meaning of the word.  I admit that the word is also frequently and properly used in the sense for which adverse counsel contend.  Do the law books recognize both meanings ?  I answer yes, whenever it can be shown that the word was intended to have either meaning, that meaning the courts will give it.  When from the context it is apparent that the word children is used as synonymous with descendants, the court will so construe it.  Thus it has been ruled that when in a will the devise is to children, when in fact there are none of the first generation, the courts construe the words as meaning descendants.

In Wild's case, 6 Co. R. 17, the devise was to Roland Wild and his wife, and after their decease, to their children.  At the time this will was made Wild and wife had children.  The court says that the gift was made to the children in being at the time the will was made, and only confers an estate for life in those children, and therefore it reverted at their death ; but the court makes the distinction : it says, " If A. devises his lands to B. and to his children, and B. hath no children at the time of the devise, the same is an estate tail, for the intent of the devisor is manifest and certain that his children or issue should take ; but as immediate devisees they cannot take, because they are not *in rerum natura*, and by way of remainder they cannot take, for that was not his intent, for the gift is immediate."  Cites an adjudicated case, in which one devised land to husband and wife, " and to the men children of their bodies begotten," and it did not appear that they had any male issue at the time of the devise ; it was adjudged that the husband and wife took an estate tail to them and the heirs male of their bodies.

Now, in both the supposed and the cited case, it is impossible to make out the entailment, except by giving to the word " children" a meaning synonymous with the words descendants or issue ; for in either of the two cases, suppose the word children to mean only

descendants of the first generation, and the estate would be one for life in them, and not an entailment. It would have reverted on failure of children, or the death of them.

In *Wyth* v. *Blackman*, 1 Ves. Sr. 196, the devise was to each of four sons, " or their respective children, one-fourth part each;" but there was a proviso, that if any one should die without issue, then to be divided among the survivors, or their respective children : p. 197. The question was, whether only the surviving children took, or whether the grandchildren and great-grandchildren, descendants of a dead brother, took; whether the word issue is to be construed by children, or children by issue? The court then proceeded to show, that since the trusts for the children might arise at a great distance of time, when there might be no possibility that the first generation would be living, then showing that construing the word children as meaning descendants, the trusts could be executed, whereas a different construction would defeat them, the court construed the word accordingly as synonymous with issue. It cites the above case, " that it is settled that children bear a coextensive sense with issue;" " then why should not the court take this to be so, if it more fully answers the intentions of the donor who created this trust, which might take effect at a distant time ?" p. 200. The court further says: " According to the authorities, grandchildren and great-grandchildren are all children, and come within that (word) to certain purposes;" and in 2 Vernon, 106, it is said, in conclusion, " that it is allowed by all, if no children are in being, grandchildren would come in under the word children, and may be thereby described :" p. 201. And the court concludes that the word children must be extended to issue, and let in both the grandchildren and great-grandchildren : p. 201.

In England, see also Ambler, 555, 681.

So in the United States. In *Pemberton* v. *Pemberton*, 5 Binney, 601, the devise was " to the children and grandchildren of my brother Israel Pemberton, deceased, except Mary Fox, and her children, she and they not needing it, to be equally divided among those of them who may be living at the time of the death of testator's widow." At that time, Israel had living, children, grandchildren, and great-grandchildren, but the parents of the great-grandchildren were dead. The question was, whether these

great-grandchildren could take under the bequest? The court assuming, that if there was nothing in the will to explain the terms children and grandchildren, the bequest would be only to those of the first and second generations, says: "But it is certain that when it appears by the will that the testator meant to comprehend great-grandchildren, the courts have given it a construction agreeable to the intent:" p. 606. Then referring to the intent, the court says: "He must have known very well that the children of Mary Fox were great-grandchildren of Israel Pemberton, and when he excepted Mary Fox and her children from any share of this bequest, he must have supposed that without such exception they would have taken;" and upon this exception, as a part of the context showing the intent of the testator as to the other great-grandchildren, the court construed the terms children and grand-children as including great-grandchildren: pp. 606, 610.

The foregoing are affirmative cases, in which the word children has been construed by the context as meaning more than descendants of the first generation. With them agree every case in which it has been decided, that in the particular will under review, the term children only means descendants of the first generation. They state the distinction, that when it is apparent that the testator so intended, the courts will construe the will as meaning issue or descendants: thus the case in 2 Vernon, 106, after confining the bequest in that will to the first generation, concludes: "But all admit, that if there had been no child, the grandchildren might have taken by the devise to his children;" thus making the fact, that there were no children, construe liberally the word children contained in the bequest: p. 108. So in the case in 10 Ves. 197. The court fully recognized the same distinction, also, in 4 Ves. 698.

The foregoing authorities show that even in wills the term children may mean more than the first generation; and if there is any clause, word, or sentence in the will, from which, by a reasonable construction, it can be shown that it was intended to mean more, the court will extend its meaning accordingly. Now if such an interpretation would be admissible in a will where the contest is between the devisee and the heir-at-law, whose rights as heir will not be taken from him except when the testament is clearly against him, with how much more force will the construction be applied to

a statute passed for the purpose of giving the inheritance to an heir, rather than permit it to be escheated to the State. In the one case, a reasonably rigid construction of the will should be given to protect the heir's inheritance; in the other, a very liberal construction of the statute should be given to preserve the inheritance, and to prevent an escheat.

Upon the foregoing principles, I might with propriety insist, without reference to the context, that because the legislative intent was to prevent escheats, to create inheritance, and confer rights, which the rigid rules of the common law denied to illegitimates, that because the construction of adverse counsel confers the inheritance on a bastard himself, and yet denies it to his legitimate offspring, a thing utterly inconsistent with the liberal purposes of the statute, it is apparent that it was intended by the legislature that the word children in the statute should mean more than the bastards themselves, more than the first generation.

But for the purposes of this argument I do not ask so much. I am not dependent on arguments predicated on the probable intention of the legislature. I only ask the concession, that the word children may mean more than descendants of the first generation, and will be construed to mean more, if the context show that it was intended to mean more. Certainly I have proven that; and if that, I now undertake to show, by the context, that the legislative intent was that in this statute it should mean more.

The statute declares, that the persons in the statute denominated children, shall inherit from each other as children of the half blood inherit under the general law of descent. Now, reverting to the principle that we must so construe the statute, that every word and sentence thereof shall have meaning and effect, I ask, what is the meaning or effect of that clause under the restricted construction of adverse counsel? Their doctrine is, that only illegitimate children of the first generation can inherit from each other as children of the half blood. By the general law of descent, brothers and sisters of the half blood inherit just as brothers and sisters of the whole blood, except that they are postponed to brothers and sisters of the whole blood. This postponement is the only distinction created by the statutes of descents. There is no other distinction. Now upon a bastard's dying without issue, none but bastard brothers and sisters, upon the construction of adverse counsel, can inherit. His

legitimate brothers and sisters do not inherit; his parents do not inherit; none of his relations can inherit, except his illegitimate brothers and sisters,—these, and these only, could possibly take the inheritance under any contingency whatever.  It is impossible to imagine a case in which they would not take it; it is impossible to imagine a case in which they could be postponed to any kindred of the whole blood.  The inheritance under the statute would therefore be precisely the same as if the words, "as brothers of the half blood," had been omitted from the statute; as if the statute had stopped when it had been thereby declared that the illegitimate children shall inherit from each other.  No meaning or effect can, under the restricted construction of adverse counsel, be given to the clause which makes them inherit "as children of the half blood;" it is a mere nullity, without use or sense, and tending only to obscure the meaning.

But if we can give to the word children a legitimate interpretation, which will make the statute mean something, when it says they shall inherit "as children of the half blood," which shall give to that clause a practical meaning and effect, we are bound to accept that as the proper meaning of the word children, as used in the statute.  I have shown, that if the context show the intention, the word may and will be construed, to mean descendants or issue. Now let us see if that construction of that word will give meaning or effect to the half-blood clause of the statute.  The construction of the word will inevitably be controlled by the result of this inquiry.

My position is, that such a construction does give meaning and practical effect to the words, "as children of the half blood," and that both the meaning and effect are eminently consistent with the liberal objects of the whole statute.

I will test the meaning and effect given by my construction, by carrying the intention beyond the first generation into the second and third, to the descendants of the illegitimate brothers and sisters.  We will suppose two bastard brothers: one of them dies, leaving a lawful child; then that child dies.  Now if my construction of the statute be correct, the surviving bastard uncle stands as a half-blood uncle to the child; if it has no other heirs, the uncle inherits by his half-blood position.  But suppose the child also left a maternal uncle, as to whom there is no question of illegitimacy; then, the degrees being the same, the bastard who stands only as a

half blood, is postponed to the maternal uncle, who stands as a whole-blood relation. But suppose, on the death of the child, it has no maternal uncle, but only maternal cousins, these are one degree farther removed than the bastard uncle, but they take as whole blood, he only as half blood; and since he is not to be postponed to them, he would take half the estate, the cousins the other half, precisely as the half bloods would under the like circumstances. But again: suppose the bastard uncle is also dead, leaving children; these stand as half-blood cousins to the child, and being of the same degree with the legitimate cousins, they, as bastards or half-bloods, would be postponed to the legitimates as whole-bloods.

I might carry the illustrations further, and into numerous other ramifications, showing that upon my construction of the word children in the statute, the half-blood clause in that statute would have a very important influence, determining where and how the inheritance vested; but the instances given show it plainly, and that is enough for the purposes of the argument.

I then revert with confidence to the rule, and insist that you must give a construction that will attach meaning and effect to these words. I urge that the legislature had some object in declaring that illegitimate children should inherit from each other " as children of the half-blood." And I insist that upon the construction of adverse counsel that clause has no meaning or effect; that upon our construction it has an important meaning and effect; that the effect is in accordance with the liberal purposes of the statute, to wit: to secure the descent by inheritance to the relations of the deceased, and to prevent escheats. Ours is a correct as well as the most liberal construction ; theirs is a wrong as well as the most illiberal construction.

But it may be answered that if the half-blood clause has, under their construction, no effect on the inheritance of illegitimate children from each other, that it does have an effect upon their inheritance from the mother.

That position, if true, is no answer to my argument. The statute reads that illegitimate children shall inherit " from each other as children of the half blood," the words quoted constitute a single clause, not broken by a punctuation; no argument can make it mean anything else but that illegitimate children inherit from each other

**

as kindred of the half blood : whether, therefore, the phrase, "as children of the half blood" does or does not apply to the inheritance from the mother, it certainly does apply to the inheritance from each other ; it certainly was intended that it should affect the inheritance between them. If, therefore, I have shown that, by the construction of adverse counsel, that phrase has wholly failed to affect in any way said inheritance, and that by my construction it has not failed to affect them, then my construction is right and theirs wrong, unless from other parts of the context they show that my construction fails in some particular in which theirs does not fail. In order, therefore, to make out an answer to my argument, it is not enough for adverse counsel to show that their construction affects the inheritance from the mother, but they must also show that my construction fails to have that effect on such inheritances. That they can never show, for any possible effect on the inheritance from the mother that would be attained by their construction, would equally be attained by mine. If, under their construction, the immediate children would take from the mother as children of the half blood, so would they under my construction, and not only they, but her children's children would also take as half-blood relations ; for their construction is, that only illegitimates of the first generation would take, on the half-blood principle ; mine is, that not only these, but their descendants, would take, on the same principle. The state of the argument would be thus : I have proved that one object of the statute, plainly apparent on its face, is wholly defeated by their construction, but is perfectly attained by mine; their answer is, that another object is attained by theirs ; I admit it, but say it is no answer to my argument, because my construction obtains your object as fully as yours does, nay, carries the very object, on which you found your argument, to an extent more consistent with the general object of the statute than yours does.

In truth, however, the half-blood clause does not apply to the inheritance from the mother. The grammatical construction of the statute, as will be seen by examining it, is favorable to this position. But let us apply the half-blood clause to inheritances from the mother, upon the construction given by adverse counsel, and see what effect it will have on such inheritances. Upon that assumption the statute would be, that all illegitimate children of the first generation shall inherit the property of their mother as children of

the half blood according to the general statutes of descent. Now, by the general statutes of descent, there is no such inheritance, because there is no such relationship as children of the half blood to the mother, and never can be; there is no such thing as a child's inheriting from the mother as a child of the half blood, and there never can be such an inheritance. It is, therefore, impossible for the statute to mean, that illegitimate children shall inherit from their mother, as her children of half-blood relationship to herself would inherit from her under the general statute of descents; that would be sheer nonsense. If, therefore, the half-blood clause applies to the inheritance from the mother, there is but one meaning to give it,—that illegitimate children shall inherit from their mother as children who, having a common mother, are half-blood relations to each other, would inherit from that mother according to the general law of descents. Now, confining the word children to the first generation from the mother, how would such half-blood relations inherit from that mother under the general law of descents? Both branches of the half-blood relations would be equally her children, and therefore would equally take her property; neither branch could be postponed to the other. But by the Act of 1846, her bastard children of the first generation (if it be confined to them) would inherit precisely in the same way, and on that construction the half-blood clause in said Act of 1846 would have no effect whatever on the inheritance from the mother; the illegitimates would, under the construction of adverse counsel, inherit from the mother precisely as if the half-blood clause were not in the statute. It is not true then that the half-blood clause affects the inheritance from the mother, if the construction of adverse counsel be correct.

But I may be asked whether, upon our construction, the half-blood clause has any more effect upon the inheritance from the mother than upon theirs? I shall not examine that question, because if it have, it is another argument in favor of my construction; if it have not, it but proves that I am right in assuming that the half-blood clause applies only to the inheritance of illegitimate children from each other. My position is, that it does not apply to the inheritance from the mother; but I have based an argument on the assumption of adverse counsel that it does, and upon that assumption I have shown first, that if true, it is no answer to my argument; and second, that if true, it has upon their construction of the

word children, no effect on that inheritance. If I am right in either of these two responses, my argument is sustained.

But my position that the right of inheritance given by the Act of 1846, is not confined to the first generation, is sustained by another clause of that act. It declares that the "illegitimate children shall inherit from their mother, and from each other, as children of the half blood, according to the Statutes of Descent and Distribution now in force in this State."

That statute is one which enlarges the general statutes of descent and distribution. It and the general statutes of descent and distribution relate to the same matter, they are *in pari materia;* in construing it, we are, therefore, to take these statutes together, as if they were one and the same act. 1 Kent, 463; 1 Burrow, 445; 1 T. R. 53; 2 Ib. 387; 3 Ib. 185; 4 M. & S. 210.

But I need hardly invoke that rule in the present case, since the Statute of 1846 expressly provides that the inheritances therein provided for shall be "according to the general statutes of descent and distribution," thereby making the general statute the sole rule of descents under the Act of 1846. It is as if the Statute of 1846 had expressly declared that the Act of 1846 should thereafter be a part of the original acts of descent and distribution. As to the inheritances from their mother and from each other, the Act of 1846 as completely puts illegitimate children in the general statutes of descent and distribution, as if they had been named in the original act precisely as kindred of the half blood are therein named; that is, precisely as other heirs are therein named, except the postponement in favor of kindred of the whole blood of equal degree. This must be so, for they do not inherit as kindred of the half blood inherit, according to the general statute, if their inheritance has not the same character and effect as has the inheritance of half bloods under that statute. The inheritances granted by the Act of 1846 are not "according to the general statutes of descent then in force," if they are limited by restrictions not known to any of the inheritances under the general statutes of descent. They are not according to the general statutes of descents if they are confined to the first generation, whereas the descent under the general statutes is to the first generation and their descendants.

To make a direct application of the argument: The Act of 1846 declares that illegitimate children shall inherit as children of the

half blood inherit, according to the general statutes of descent. According to the general statutes of descent, not in one particular only, but in every particular. These, therefore, constitute the rules governing the inheritances, under the Act of 1846, in all things. By them must we determine who will take under the Act of 1846, and the quality and quantity of the estate which will be taken. The parties taking under the Act of 1846, will not take according to the general statute of descents, if he inherits according to these in one particular, but unlike them in other particulars. Kindred of the half blood inherit where there are no whole-blood kindred of equal degree. So must illegitimates, if they inherit according to the statutes of descent. Kindred of the half blood, where there are no kindred of equal degree of the whole blood, inherit just as do kindred of the whole blood; so must illegitimates, if they inherit according to the general statutes of descent. Kindred of the whole blood and of the half blood inherit to them and their descendants, the descendants taking the shares of the parents. So must illegitimates, if they inherit according to the general statutes of descent. In short, the inheritances authorized by the Act of 1846 cannot and will not be according to the general statutes of descents, unless 'the inheritance is according to the language of that general statute,—"to children and their descendants in equal parts, the descendants of the deceased child or grandchild to take the share of the deceased parent;" or "to the brothers and sisters of the intestate and their descendants, the descendants of a brother or sister of the intestate to have, in equal parts among them, their deceased parent's share." The Statute of 1846, requiring that the illegitimate children shall inherit from their mother and from each other, according to the general statutes of descent, is of the same import as if it had omitted the words, "according to the statutes of descent and distribution now in force," and instead thereof had embodied the clauses above quoted from the general statutes of descent. There is no avoiding the conclusion, that in all things the inheritances created by the Act of 1846 are coextensive with, and in all things governed by, the general statutes of descent.

The adverse position is, that illegitimate children shall inherit from their mother and from each other in equal parts, but that the inheritance from the mother is not to the children in equal parts, the descendants of the deceased child or grandchild to take the

share of the deceased parent; that the inheritance from each other is not to the brothers and sisters and their descendants, the descendants to take the parent's share. They put direct negatives upon the very language of the general statutes of descent; how then can it be according to those statutes, as required by the Act of 1846?

Again, if the legislative intention was such as is contended for by adverse counsel, why was the inheritance given to the illegitimates " according to the statutes of descent?" That intention would have been much more plainly and unequivocally expressed, if the statute had not contained the words, " according to the statutes of descent and distribution;"—if it had only said that illegitimate children shall inherit from their mothers and from each other, and had stopped there. If such was the legislative intention and meaning, these are obscured, not elucidated, by the clause under consideration. But on the other hand, if the legislative meaning and intent was according to my construction, it is difficult to imagine words which would more plainly have put the inheritances by illegitimates precisely in the same position that the inheritances by half bloods occupied under the general statutes of descent. Upon our construction, the legislative intention is elucidated, not obscured, by the words quoted, that "illegitimate children shall inherit from their mother and from each other, as children of the half blood, according to the statutes of descent."

Again, the position assumed against the petitioners is founded on a most rigid literal construction, to wit, that the word children means only descendants of the first generation, and we must stick to the word. But if a rigid construction is to be applied against petitioners, I ask that it may be adhered to when its results are favorable to them. Do the words of the statute, literally applied, mean that illegitimate brothers and sisters only shall inherit from each other? That meaning cannot be given without going outside of the language of the statute. It says that illegitimate children shall inherit from each other as kindred of the half blood, according to the statutes of descent; all illegitimate children; not only illegitimate children who are brothers and sisters, but illegitimate children who are cousins, or of any other consanguinity that would, if they were legitimate, entitle them to inherit according to the general statutes of descents. Construe the statute literally, and it

simply means that all bastards, if within the heritable degrees of consanguinity, according to the general statutes of descents, shall inherit from each other as half-blood relations. Such a construction puts all the relations, who are illegitimate children, on the same footing, as to inheritances, as the general statutes of descent would put them, if they were legitimate children of half-blood kindred in the same degree.

But I may be told that this construction is too rigidly literal. I answer, not more so than that of opposing counsel. They claim a literal interpretation of the word children, according to what they suppose it to mean. I insist that, upon the literal rule, no words shall be interpolated to make "illegitimate children" mean only brothers and sisters who are illegitimate children. I insist that those two words shall have their full scope, and mean all illegitimate children. They are limited only by the clause that they shall inherit as half bloods, and according to the statute of descents.

But I may be told also that the illegitimates must have a common mother, in order to come within the language of the statute, and therefore only illegitimate brothers and sisters can inherit from each other. That is taking my rule, and going to the context for the construction. But I deny that there is anything in the context which shows that the illegitimate children who inherit from each other must have a common mother. There is no such language in the statute; it does not even say that illegitimate children shall inherit from their mother, but it says they shall inherit the property of their mothers. Not that illegitimate children who are brothers and sisters shall inherit from their mothers and from each other; but that all illegitimate children shall inherit from their mothers,—all illegitimate children shall inherit from each other, if the degree of consanguinity would entitle them to inherit as half-blood relations, according to the general statutes of descent.

By a rigid literal construction of the statute, therefore, the inheritor could, by a succession of illegitimates, be carried to the most remote generation. Will it be said that this is true, and yet that the property would escheat if the last in the line should be legitimate? Was it the legislative intent that all bastard kindred should inherit from each other so long as they preserved the ille-

NOTE.—The omission of paging 156 to 160 is intentional.

gitimacy immaculate, but that if the chain of illegitimates was broken by a legitimate birth the property escheated? If such was the intention, the legislature meant to encourage fornication and prevent marriage.

Such is the result of a literal construction of the words of the statute, as contended for by opposing counsel. A much more reasonable result will be attained, if we will liberalize the construction a little.

The rule that a bastard cannot inherit is from the feudal maxim, " that he is *nullius filius;*" that he has neither father, mother, brother, nor sister, nor any kin but his legitimate descendants; that without these he has no consanguinity. Not one word of this was true, except as applicable to inheritances and successions; as to all things else, his illegitimate consanguinity was recognized in law. He could be convicted of incest; he could be convicted of marriage within the prohibited degrees.

He was not without any legal consanguinity. It was only true that that consanguinity did not authorize inheritance, as did legitimate consanguinity. Inheritable consanguinity was wanting in him; and that broke a link from the hereditary chain that ran through him from his ancestors to his descendants. The Statute of 1846 supplied the link, for it gave to his illegitimate consanguinity the inheritable quality. It put the consanguinity between the mother and her illegitimate children themselves, on precisely the same footing as the consanguinity of half-blood kin, according to the statutes of descent. The bastard was no longer, even as to inheritances, *nullius filius;* but he was, as to these, the son of his mother; he was no longer, even as to inheritances, the brother of no person; but he was, as to these, the half-blood brother of his illegitimate brothers and sisters; and all the inheritable consequences followed, to wit : that being the son of his mother he could take and transmit inheritances from her; being the half-blood brother of his illegitimate brothers and sisters, he could, as a half-blood brother, take and transmit the inheritances from them, according to the general statute of descents. The illegitimate stands under the statute as if he were a legitimate son of his mother, and the legitimate brother of the half blood to his illegitimate brothers and sisters, and the inheritance descends to him, or through him, according to the general statute of descents. Such

was, doubtless, the legislative intention in making the law. It leads to no such absurd results as does the rigid, literal construction urged by opposing counsel.

If the foregoing propositions be true, my construction of the Statute of 1846 must be correct, for they show that it is sustained by every proper principle applicable to the construction of such a statute : by the liberal purposes of the legislature in waiving the escheat and making illegitimates heirs ; by the context, because it gives to the words " as children of the half blood" a meaning and effect consistent with the general purpose of the statute, whereas the adverse construction gives those words no meaning or effect whatever ; also because it gives to the words " according to the general statutes of descent" a practical bearing upon the meaning of the Act of 1846, and in elucidation thereof, whereas upon the adverse construction, those words only obscure the meaning; and by the results, because my liberal construction produces results harmonious in themselves and consistent with the general purpose of the act, whereas the adverse rigid construction produces consequences unreasonable in themselves and inconsistent with the general purpose of the act. If these positions, or either of them, be true, I confidently conclude that since the word children may mean more than descendants of the first generation, it must mean more than these in the Act of 1846, and that therefore the proper construction of that act is in favor of petitioners.

But it is seriously urged by opposing counsel, that if Josiah Horton died before the date of the Act of 1846, the petitioners cannot inherit for that reason. I can see no force in that position. The question is, not what was the law at the time Josiah Horton died, but what was the law at the time the descent was cast by the death of Mrs. Reagen, in 1852. If the law then was as I have urged that it was, the descent was cast upon the petitioners under that law, they taking under that law as half-blood nephews and nieces, according to the general statutes of descent, and this result would not be changed by Josiah Horton's death, either before or after the date of the Act of 1846. It is not a question whether or not they took from him, for since he died before Mrs. Reagen, he never had any right, title, or interest, and that is true whether he died before or after the Act of 1846; but it is a question whether

or not they take from her, and that depends only on what was the law at the time of her death. If, therefore, my construction of the Act of 1846 be correct, they are certainly her heirs and distributees.

HARRIS, J., delivered the opinion of the court.

The nuncupative will of Cecilia Reagen, deceased, was admitted to probate in common form, in the Probate Court of Hinds county, on the testimony of George J. Hulme and William L. Rhodes.

Roderick M. Rutland, claiming to be the brother of the decedent, and Archibald A. Gaulding et al., claiming to be the nephews and nieces of the said Cecilia, filed their petition in the Court of Probates, as the heirs at law of said Cecilia, seeking to set aside the probate upon the ground of fraud, mental incapacity, and the invalidity of the acts relied on to establish a nuncupative will.

The answer to the petition states that Cecilia Reagen was an illegitimate; denies that petitioners are her heirs at law and distributees; denies all fraud in the execution of the will, and asserts its validity, both as to the capacity of the testatrix and the act of nuncupation.

Upon this petition and answer, the Court of Probates directed two issues to be made up and tried by a jury, to ascertain, 1st, the heirship of petitioners; and, 2d, *devisavit vel non.* These issues were both submitted at the same time, to the same jury, against the objections of the administrator and appellant, and this constitutes the first ground of error complained of.

It has been certainly a leading object in legal proceedings, especially by the principles of the common law, to avoid duplicity in pleading, or a multiplicity of issues. The great design of the system of special pleading established by the common law, was to reduce the mutual altercation of the parties to a single issue, that the jury might readily comprehend and decide the truth between them. And even under our relaxed system, it has always been the just policy of courts, to avoid all *unnecessary* issues.

In the case before us, under the provisions of our statute (Hutch. Code, 651, § 29), "*any person interested*" had the right to contest the validity of the will in question. If the conscience of the court was not sufficiently informed by the petition as to the *interest* of the petitioners, it certainly had the right to order an issue to be

ascertain that fact, but in doing so, the rules of law, established for convenience, certainty, and economy, as well as the attainment of justice, require that the preliminary question, upon the determination of which the necessity for further inquiry wholly depends, should be first disposed of. The whole merits of the controversy might otherwise be investigated and determined at the suit of mere strangers, having neither right nor interest therein; when, if the *single* preliminary issue, of the *interest* of the party petitioning, and his right to file his petition, had been submitted by itself, the expense, delay, and perplexity of such further investigation, might oftentimes be avoided. Another reason why such a practice should not be indulged, is that it must result, as in this case, in the violation of other important rules of law, securing for just and wise purposes, certain rights to parties to such issues. The party affirming the truth of the facts involved in an issue, taking upon himself the burden of proving those facts, is allowed the opening and conclusion of the argument. But if a multiplicity of issues can be thus submitted to the same jury, at the same time, by the order of the court, the right thus secured may, without necessity, by such order, be taken from the party entitled thereto, on the main question involved, and transferred to his opponent. We think it, therefore, most safe, just, and consistent with the principles and practice heretofore prevailing, that the Court of Probates in ordering the trial of issues to inform its conscience on disputed facts, should submit but a single issue to the same jury; when that issue more especially, as in this case, involves the ascertainment of a precedent fact, the determination of which may preclude further inquiry.

It is next insisted in argument by counsel for appellants, that the court erred in excluding the record of the former probate of the will in common form. We think there was no error in this. As a judgment, it could not affect the parties to this proceeding, who were neither parties nor privies, nor in any manner notified of the former probate and judgment; and having no opportunity to contest it, or to be heard in opposition to it, on well-settled principles, it could have no binding force or validity as to them.

The most important point involved in this cause, arises upon the construction of the Act of 23d February, 1846, conferring certain rights upon *illegitimate* children. By the 4th section of that act,

Hutch. Code, p. 501, it is provided that " Hereafter, all *illegitimate* children shall inherit the property of their mothers, and from each other, as children of the half-blood, according to the Statutes of Descents and Distribution now in force in this State."

The record shows that the decedent, Cecilia Reagan, was herself an illegitimate child of Jemima Cotton; that Josiah Horton was also an illegitimate child of the said Jemima Cotton; that the petitioners, except Rutland, are the *legitimate* children of Josiah Horton; that the said Josiah Horton died before the 23d February, 1846, and that the said Cecilia Reagan died in the year 1852, leaving no heirs or distributees, unless petitioners are to be so regarded; that the said Rutland is the legitimate child of the said Jemima Cotton, born in lawful wedlock, after the birth of the said Cecilia Reagan and the said Josiah Horton.

The question here presented, therefore, is, whether under the Act of 1846, above quoted, the *legitimate* children of an *illegitimate* half-brother, who died before the passage of the act, and before the death of his half-sister, Cecilia Reagan, can inherit from her, she being illegitimate.

It is insisted that the act in question was designed to confer upon bastards, as a class, the right of inheritance, and to prevent escheats, and being a remedial statute, it should be liberally and beneficially expounded, so as to advance the remedy, and suppress the mischief, intended to be remedied.

If the intention of the legislature were obviously to confer inheritable blood, or the right of inheritance generally, upon bastards as a class, our duty would be plain and easy. But the restricted language of the act in question, especially when considered in reference to the policy of the law in all ages and countries, in reference to this unfortunate class, clearly shows that it was not the design of the legislature to destroy the disability of bastards generally, or to confer inheritable blood. Not only the laws of England, but those of all other civil states, formerly excluded bastards from inheritance, unless there was subsequent legitimation; and this, to discourage illicit commerce between the sexes. 2 Kent (9th edit.), 230.

It seems to have been the design of our legislature to modify the rigor of the ancient law; but, at the same time, not to give too

much countenance to the indulgence of criminal desire; while it is designed not to suffer *illegitimate children* to be cast naked and destitute upon the world, it is certainly not designed to give license to promiscuous concubinage, by destroying the penalties, disabilities, and degradation which the common law has wisely attached, to such unlawful indulgence. 2 Kent, 232. We are, therefore, to examine the act in question in reference to the principles of the common law; for it is not to be presumed, that the legislature intended to make any innovation upon the common law, further than the case absolutely required. 1 Kent (9th edit.), 521. In the construction of the act, it is never to be forgotten that bastards are liable to all the disabilities to which the common law subjects them, as such, except those from which the *statute itself* exempts them. *Stevenson's Heirs* v. *Sullivant*, 5 Wheaton R. 250 ; *Scroggin* v. *Allen*, 2 Dana Kentucky R. 363–4. By the common law bastards are wholly without inheritable blood, and for this reason they cannot take by descent.

Nor can they transmit by descent, except to their own legitimate offspring; for they can have no other heirs. 4 Kent, 9th edit. 461–3; 2 Kent, 230–232.

Our Statute of 1846 relates only to one class, *illegitimates*. These petitioners are *legitimate*. They do not, therefore, take, unless by representation. If the act conferred any right of which the father, Josiah Horton, died seised or possessed, not devised or bequeathed, the general Statute of Descents and Distributions cast the inheritance upon his children, and not otherwise.

The children of Josiah Horton can acquire nothing more than their father was seised or possessed of at his death. They can claim nothing by the Act of 1846 as descendants, *jure representationis*. Nor can they claim any right (under the Statutes of Descents and Distributions), of which their father was not seised or possessed at his death. As a dead man can acquire no right, his heirs cannot, by representation, acquire more than he was entitled to at his death.

It is only by virtue of the Statutes of Descents and Distributions that the *descendants* of *legitimate* children acquire the right of representation, as the heirs at law of their parents. The Act of

1846 gives no right of representation to descendants, as does the act of Maryland.

By the common law, it is the seisin which makes the *stirps*. "*Non jus sed seisina facit stipitem.*" If, therefore, the heir on whom the inheritance had been cast by descent, die *before* he acquires the requisite seisin, his ancestor, and not himself, becomes the person last seised, to whom the complainants must make themselves heirs. 4 Kent, 9th edit. 428, and 454, note.

The act was passed on the 23d February, 1846. On its face it applies to the *future*. "*Hereafter*, all *illegitimate* children shall inherit *the property of their mothers ;* and from each other as children of the half-blood, according to the Statutes of Descents and Distributions now in force in this State." It is clear, therefore,

1st. That Josiah Horton, from whom these petitioners must claim, if at all, died *before* the passage of the act, and long before the death of Cecilia Reagan, his half sister, and could not therefore have any right or seisin in *himself*.

2d. The claimants are *legitimate* children, and not therefore embraced in the provisions of the act.

3d. By the terms of the act, they cannot inherit from the decedent, because she is not their mother or sister.

4th. They are to inherit the property of their mother, and from each other. How ? not generally, but " as children of the half-blood" would inherit " according to the Statutes of Descents and Distributions now in force in this State." That is, they shall not inherit absolutely, and at all events, from their mother, if she have *legitimate* children living at her death; but they shall then be excluded as children of the half-blood, while the *legitimate* children shall be regarded as children of full inheritable whole blood. They shall not inherit absolutely from each other, to the exclusion of *legitimate* children of their illegitimate brother or sister, but they shall be regarded as to such legitimate children of their illegitimate brother or sister, as if they were children of the half-blood, and therefore postponed as to them, according to the Statutes of Descents and Distributions now in force.

In both cases, whether inheriting *from their* mother or from each other, they are to be regarded for the purposes of distribution, as *children* of the half-blood, who are to be postponed to legitimate

children of the whole blood. It was designed by this standard of inheritance, making them children of the half-blood, both to their mother and to each other, to preserve in legal contemplation a distinction between the fruits of legitimate and illicit intercourse; and thus to vindicate and encourage the one, and discourage and prevent the other.

In any view, therefore, of this act, it does not entitle these petitioners to claim the property of Mrs. Reagan as her heirs at law, or to institute the proceedings here invoked. They are not "interested" in the estate of Cecilia Reagan, or in the re-probate of her will, and have therefore no right to stir up this litigation.

As the determination of this question must finally dispose of this case, it is unnecessary to consider the questions raised as to the validity of the will.

Let the judgment and decree below be reversed, and petition dismissed.

SMITH, C. J., dissented.

A petition for a reargument was filed, but a reargument was refused.

———— ‹ ◦ ◦ › ————

P. D. S. FRENCH v. SAMUEL C. DAVIS and WIFE.

1 PROBATE COURT: PRACTICE AND PLEADING: CROSS-BILL: DISTRIBUTION.—Petitions for the distribution of estates are informal, and not regulated by technical rules; and it is competent for either party to introduce such evidence, in proceedings of that character, as may be necessary to show what judgment shall be rendered, without regular and formal pleadings; and hence, the administrator is not entitled to make his answer to a petition for distribution, a cross-bill, as such a proceeding is not necessary to enable him to make any defence which he may have.

2. SAME: SAME: DECREE FOR DISTRIBUTION: REFUNDING BOND.—A decree on a petition for distribution, which merely directs the administrator to pay and deliver over to the petitioner the sum ascertained to be his distributive share, but does not order execution to issue to enforce it, is in effect a decree to make distribution according to law, and if made before final settlement, it cannot be enforced until a refunding bond is executed; and it is not, therefore, liable