ILLINOIS CENTRAL RAILROAD COMPANY *v.* SOPHRONIA JOHNSON.

1. DEATH OF PERSON. *Action for. Lord Campbell's act. Bastard.*

An illegitimate daughter cannot maintain an action for damages caused by the wrongful killing of another illegitimate daughter of the same mother, since our statute creating causes of action for the death of a person. like Lord Campbell's act, confers the right to sue only on legitimate relatives.

2. SAME. *Descent and distribution. Code 1892, § 1549.*

Code 1892, § 1549, enabling illegitimates to take by inheritence in certain cases, does not embrace causes of action for the death of a person.

FROM the circuit court of Lincoln county.

HON. ROBERT POWELL, Judge.

Sophronia Johnson, the appellee, was the plaintiff in the court below; the railroad company was defendant there. A judgment and verdict was rendered in the court below in plaintiff's favor for $1,625, and the defendant appealed to the supreme court. The opinion states the facts.

*Mayes & Harris,* for appellant.

Section 1549 of the code of 1892 is in derogation of the common law, and it is well settled that such statutes, particularly relating to this subject, must be strictly construed, not only according to the letter of the act, but also in reference to the purposes for which the act was passed.

In *Edwards* v. *Gaulding,* 38 Miss., 118, it was held that a like statute, being an innovation of the common law, is to be strictly construed, and did not remove any disability or confer any rights on illegitimates except such as are specially named in the act. This same rule generally prevails. *Hicks* v. *Smith,* 94 Ga., 609; *Ex parte O'Neal,* 92 Pa. St., 193; 2 Am. & Eng. Enc. L., 130, notes.

The plaintiff in this action could have inherited, under the statute, any property which had been left by her deceased half-sister, and that is all. A right of action to sue for her death is not inheritable. At common law personal actions died with the person, and it is only by virtue of statutory provisions that a suit could be brought in such case.

Plaintiff's right of action, if any at all, comes from Lord Campbell's act as amended, and that act being in derogation of the common law, must also be strictly construed, and cannot be held to embrace within its terms persons who at common law would not have had a right of action.

It has been held that the word "child," as used in Lord Campbell's act, does not mean illegitimates. *Dickerson* v. *Railroad Co.,* 2 Hurlestone & Coltman, English Exchequer, 734;

*Gibson* v. *Midland Railway Co.,* 15 Am. & Eng. R. R. Cases, 507; *Porter* v. *Porter,* 7 How. (Miss.), 107; *Marshall* v. *Railway Co.,* 46 Fed. Rep., 269; *Good* v. *Towne,* 56 Vt., 410; Black on Law & Practice in Accident Cases, sec. 109, and cases cited; Tiffany on Death by Wrongful Act, paragraph 85; *Edwards* v. *Gaulding,* 38 Miss., 118.

It was not the intention of the lawmakers to embrace illegitimates in our adoption of Lord Campbell's act, because at common law they were not embraced, and Lord Campbell's act being in derogation of the common law, can only embrace such persons sustaining such relations to each other as are recognized as legitimate relations at common law, and therefore, must necessarily exclude bastards.

*Cassedy & Cassedy,* for appellee.

The construction of laws of 1898, p. 82, amending § 663, code, is involved. This statute gives to certain specified relatives a right of action in cases of wrongful injuries causing death. Whether the statutes mean only those members of a family recognized as brother and sister under the common law, or whether the term "sister" means, not only the daughter of the same mother born in wedlock, but also includes that class of unfortunates, the sins of whose mothers are visited upon their unoffending heads, is to be determined under the law as it now exists. At common law bastards were the children of nobody, not even their own mother, and had no kindred. They could not inherit, nor could any one inherit from them, save their own legitimate offspring. They were the beginning of their race, not even akin to humankind—monsters, so to speak—conceived in sin and born in iniquity, with no rights, no name, and no people. Such being the common law, debased and denied the common rights of humanity because of a misdirected public policy, when the word "child" was mentioned in a statute, or "children," it did not include the bastard, nor could he be included in the "next of kin." We

can understand and appreciate this reasoning, because the bastard, being the child of nobody, could not therefore have kindred. It was this harsh rule of the common law which was sought to be abolished in the several codes and acts of our legislature, from 1822 to 1892, by our several statutes of descent and distribution. And thus, under our statutes, the rule of the common law that an illegitimate had no inheritable blood; that he was not included amongst the children of a common mother, nor was he "a child," nor could he be counted among the "next of kin," has been abolished, and with it the reason of the rule. He could not inherit because he had no inheritable blood; he could have no brothers or sisters, because he was the son of nobody, and had no kindred for the same reason. But under our statute of descent and distribution, he has a mother, brothers, sisters, and kindred, and the mother being always certain, he inherits from her, her children, and her kindred. Under this state of the statute law of the state, the bastard being recognized as having some rights, that he has a mother and could inherit from her, and her "other children" and her "kindred," thus creating for him a mother, sisters and brothers, and fixing for him the tie of family relationship, the statute of 1898 was enacted.

Surely that act, saying that when such deceased person shall have left a mother or sister or brother, it did not only mean a legitimate mother, sister or brother, and exclude the bastard, and, we submit, the lawmakers had no such idea.

In view of our statute of descent and distribution (chapter 33 of the code, the act in question dividing the damages in accordance therewith), the act of 1898 was meant to include all persons who bore that relationship at the time of the passage of the law and who were recognized as such both by law and custom. In the absence of this statute of descent and distribution, of course the bastard would not have been contemplated in the act of 1898, because, applying the common law (and it is presumed that the act was written with reference to the

existing law), he had no mother, sister, or brother or next of kin.

In the case of *Porter* v. *Porter,* 7 How. (Miss.), 106, the court holds that bastards are not contemplated under the word "children" in our statute of descent and distribution as it existed at that time. This case was decided prior to the act of 1846, and, of course, prior to the several codes since that time, so the decision can be of no force now under the changed condition of the law on the subject. All the cases, in all the states, where the interests of a bastard were at stake, turned upon the peculiar phraseology of the particular statute, and such statutes as were *in pari materia.* It has been the intention of the legislature, evidenced by the several statutes, to change the common law entirely as to bastards. That rule was that they had no inheritable blood. Now they have. That rule was, dying intestate, leaving no heirs of their body, their property escheated to the crown; now it would be disposed of in accordance with our statute of descent and distribution. In other words, a bastard, under our laws as they now exist, is entitled to all and every benefit of the law as if he were legitimate, so far as the mother and her kindred are concerned. The only difference is that the children of illegitimates "cannot inherit from any ancestor or collateral kindred if there be legitimate heirs of such ancestor or collateral kindred in the same degree to whom the estate would otherwise descend." If this is a badge of disgrace, it was once applied to the half-blood born in lawful wedlock. So we say that the illegitimate now has all the rights that a legitimate of the half-blood had, under the common law, with reference to the inheritance of property from and through the mother. This innovation of the common law has not been made by construction, either liberal or strict, but is the outcome of the wisdom of the lawmakers, beginning in the very dawn of our statehood and continuing up to the present time, evincing a determined purpose to give to the unfortunate, who could not choose for himself whether he

would be the son of lust and dishonor or the child of lawful wedlock, the same rights enjoyed by his brother, who, by accident so far as he is concerned individually, came into the world with the blessings of the priest.

CALHOON, J., delivered the opinion of the court.

Under the laws of this state, can the illegitimate half sister bring an action for damages against a railroad company for negligently causing the death of her illegitimate half sister?

Dora Beard, a young woman of illegitimate birth, was killed in the incorporated municipality of Brookhaven by the employes of the appellant company by what is known as a "kicking switch." Sophronia Johnson, the appellee, was the illegitimate half sister of Dora Beard. They were both the offspring of the same mother by different fathers, and Sophronia brought this action and recovered damages.

We look first, of course, to the common law, and we cannot better define the condition of the deceased, or the rights of plaintiff, than we find in the brief of her accomplished counsel, who say: "At common law they [illegitimates] were the children of nobody, not even their own mother, and had no kindred. They could inherit nothing, nor could any one inherit from them save their own legitimate offspring. They were the beginning of their race, not even akin to humankind—monsters, so to speak, conceived in sin and born in iniquity, with no rights, no name, and no people."

We should be glad, if we had space, to follow by quoting the subsequent remarks of this very able brief, since they illustrate true eloquence, the lightning of passion playing along the line of thought. But we must content ourselves with the ice-cold law, from which no friction will excite sparks.

The common law must govern us except where it is modified by statutory enactment.

Accepting, as we do, the description of the status of bastards at common law furnished us by appellee's counsel, it may be

noted that the basis of the rule was the discouragement of immorality in the promiscuous intercourse of the sexes not sanctioned by the public contract of marriage. The effect of the law on the millions who were governed began, after the lapse of centuries, to dawn on the minds of the select few who governed them. These few, at occasional intervals between the numerous avocations of the multitudinous pleasures afforded by wealth, began to observe that bastardy continued to prevail, that illegitimacy of birth, notwithstanding the thunders of the law from parliament house, the right reverend clergy and the wigs and gowns of the courts, continued to be, as it always had before, a "condition, and not a theory." Bastards still dotted and spotted the kingdom as before, and, while the particular kingdom was in no worse situation in this shocking regard than the other kingdoms, empires and suzerainties of earth, still it was in no better, to say the least of it. It was seen to prevail still.

So, the premises being well considered for seven hundred years or so, it finally dawned on the benevolent minds of a few of "my lords and gentlemen," who, we must assume, were not at all interested personally in the question, that the unoffending, unconsulted and innocent offspring of unhallowed natural appetite, ought to have some sort of consideration. Thereupon a law was enacted magnanimously recognizing that bastards were, in its eye, as in fact, the children of their own mothers.

The slow process of evolution has, up to the date of this opinion, on the doctrine of gradual deviation from the original type, developed § 1549 of the code. This section, on the point now being considered, has these words: "And illegitimates shall inherit from their mother, and from her other children, and from her kindred according to the statutes of descent and distribution; and the children of illegitimates and their descendants shall inherit from the brothers and sisters of their father or mother, whether legitimate or illegitimate, and from

their grandparents. But the children of illegitimates shall not inherit from any ancestor or collateral kindred, if there be legitimate heirs of such ancestor or collateral kindred, in the same degree, to whom the estate would otherwise descend."

This statute gives bastards something in the neighborhood of half a showing.

The common law and the statute law being stated, it is now necessary to show both on the subject of the rights of kindred to sue for damages for the wilful or negligent killing of one of their blood, premising the observation that there is nothing whatever in the statute of descent and distribution making any right of action inheritable either by legitimates or illegitimates.

By the wisdom of the common law, so profound as to be quite undiscernible, if a man was hurt by the negligence of another he might sue for damages, but if he was killed by the negligence, neither his heirs, nor his executor or administrator, could sue at all, thus making it much cheaper to kill him than to hurt him. This was the law for twelve or thirteen hundred years, or such a matter of time, when there was a sudden, sportive variation of type shown by Lord Campbell's act of 1846, which gave the right to the personal representatives.

This variation has, fortunately, been persistent. It has evolved a new type, and has developed it into so improved a condition as that, in our own state, we find in the acts of 1898, p. 82, a provision that a "sister" or "brother" may sue for the death of a sister or brother.

It will be seen that the code in the chapter on descent and distribution makes an innovation on the common law in favor of illegitimates in regard to inheritance, but nowhere in that chapter makes rights in action for torts transmissible by descent, and at common law they were not so transmissible.

Lord Campbell's act, the progenitor of the act of 1898, and this act, give the right to sue to certain survivors, and these acts are also an innovation on the common law, which gave no

such rights, and neither act deals with inheritance, nor makes any mention of illegitimates.

Now, it has been held, under Lord Campbell's act, and on acts similar to ours, that the courts will not extend by construction so as to encourage immorality, and that when legislative acts enabling survivors to sue use the word "kin" they mean legitimate kin, and when they say father or mother, children or brothers or sisters, they mean only legitimate father or mother, children, brothers or sisters. Black's Law and Pr. in Ac. Cases, sec. 109, note 31; Tiffany, Death by Wrongful Act, sec. 85, note 15.

Where a statute gave the right to a "parent," it is held that even the mother cannot recover for the death of her own illegitimate child, as Mr. Tiffany says, and he refers to *Harkins* v. *Philadelphia Railroad Co.,* 15 Phila., 286, and he says the rule is the same under the Missouri statute, giving the right to sue for the death of a "minor unmarried child, whether natural born or adopted," and he cites *Marshall* v. *Wabash Railroad Co.,* 46 Fed. Rep., 269. He also cites *Dickinson* v. *N. E. Railroad Co.,* 2 Hurleston & Coltman, 2 Exchequer, 735, and two other cases not accessible to us, and he refers also to *Good* v. *Towns,* 56 Vt., 410, which holds that, under a statute giving action for death from liquor illegally sold, an illegitimate child cannot recover for the mother's death. We have verified all the cases he cites except the two not accessible, and they fully sustain the text. See, also, *Hibson* v. *Midland Railway Co.,* 15 A. & E. R. R. Cases, 507, old series. The only case to be found *contra* is *Muh's Admr.* v. *So. Mid. R. R. Co.,* 10 Ohio St. Rep., 276, and there it was the administrator who sued, as he might by the statute, and the court said *en passant,* under a statute using the words "nearest of kin," that the nearness or remoteness of kin where the mother was concerned, did not depend "upon the circumstances of his (the child's) being born within or without lawful wedlock." The court seems to assume this as being a mat-

ter without question, does not cite or discuss an authority, and manifestly had not examined into the question.

It is certain that in all those states applying strict construction to statutes innovating on the common law, it is uniformly held that illegitimates are never considered as being included unless they are expressly included, and that statutes giving persons remedies which they did not have at common law cannot be helped by reference to statutes of descent so as to take in the kin of bastards.

Now, it is well known that no state has gone farther than our own in this line of strict construction of enactments changing the common law so as to intend nothing not expressly mentioned changing that law. This rule runs through all our decisions, of which we refer to *Edwards* v.*Gaulding,* 38 Miss., 118, and *Porter* v. *Porter,* 7 How. (Miss.), 111, 112, as directly pertaining to the subject in hand.

We feel compelled, much against our inclination, to declare, as the existing law of the land, that plaintiff below could not sue.

*Reversed and remanded.*