MALONE *v.* POPE *et al.*

(Division B.   May 27, 1940.)

[196 So. 319.   No. 34138.]

D. M. Featherston and Lester G. Fant, both of Holly Springs, for appellant.

48

**Hunter K. Cochran**, of Holly Springs, for appellees.

Argued orally by **Lester G. Fant**, for appellant, and by **Hunter K. Cochran**, for appellees.

**McGehee, J.**, delivered the opinion of the court.

The deceased, Lizzie Polk, who had a fixed place of residence at Holly Springs, Marshall County, Mississippi, at the time of her death on July 1, 1938, left an estate of

personal property in that county, worth approximately $2,750, and a small tract of land in the State of Oklahoma. She was a colored woman, and died intestate, at approximately 78 years of age, and left no children. The appellant qualified as administratrix of the estate within a few days thereafter. There were no debts other than the expenses of last illness and burial, and this litigation grew out of a controversy as to who is entitled to the net assets of the estate. Appellant claimed in her petition for letters of administration that she was the nearest of kin, half-sister, and sole surviving heir-at-law of the deceased, Lizzie Polk. The appellees, Eck Pope and his sister Lyda Pope Blakely, obtained leave to intervene, and they claim the property as the children and sole heirs-at-law of William Polk, Jr., deceased, an alleged legitimate half-brother of the intestate Lizzie Polk. And the proof at the hearing disclosed that William Polk, Jr., had changed his name many years ago from Polk to Pope, on account of having had some controversy with a white man of the same name about some mail.

The testimony on behalf of these intervenors, appellees here, disclosed that the father and mother of William Polk, Jr., were William Polk, Sr., and a woman named "Patsy;" that they were known to be living together as husband and wife about six years after the Civil War, according to the testimony of one Simon Gillam who says that he was born in 1854 and came to Mississippi from Raleigh, N. C., when he was about 21 years of age "during President Grant's Administration," that is to say, the witness claimed that he was 85 years of age at the time of the trial in the court below; that "Patsy" died, and that thereafter William Polk, Sr., and "Louise" began living together, as husband and wife, and became the parents of the intestate Lizzie Polk. There was no proof of record, or otherwise, of a ceremonial marriage between either the parents of William Polk, Jr., or those of the said Lizzie Polk.

In the case of Andrews v. Simmons, 68 Miss. 732, 10 So. 65, it was said that: "Chapter 4, Act of 1865, declares 'that all freedmen, free negroes, and mulattoes who do now and have heretofore lived and cohabited together as husband and wife, shall be taken and held in law as legally married, and the issue shall be taken and held as legitimate, for all purposes.' . . . To further meet the necessities of the changed condition of those who had been in slavery formerly, a constitutional provision, in substantial agreement with the act of 1865, was inserted in the twenty-second section of the twelfth article of the constitution of 1869, by which it was declared that 'all persons who have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, and their children, whether born before or after the ratification of this constitution, shall be legitimate.' It will be observed that the constitution went no further than to establish the relationship of marriage between persons who were then living together and cohabiting as husband and wife, and to render legitimate the children of such persons, whether born before or after the establishment, constitutionally, of such marriage relationship."

No proof whatever was offered by the intervenors to show that the persons hereinbefore mentioned as parents of their father, William Polk, Jr., or those of the intestate Lizzie Polk, were living together and cohabiting as husband and wife, either at the time of the passage of the Act of 1865 or the adoption of the Constitution of 1869, notwithstanding the fact that the age of the said Lizzie Polk, at the time of her death in 1938, and who was younger than her alleged half-brother William Polk, Jr., was clearly established to be approximately 78 years by the witness John Martin, on behalf of intervenors, who was 72 years of age and testified that he had known Lizzie Polk since he was 10 or 12 years of age, and who admitted that she was a "good deal" older than he was, and also by the witness Betty Elliott, on

behalf of the appellant, who was 76 years of age and had known Lizzie since they were children together, and testified that she was a year or two older than the said witness. Then, too, the intervenor Eck Pope testified that his own age was 62 at the time of the trial, having been ''born in 1877,'' showing that his grandparents, William Polk, Sr., and ''Patsy,'' could not have first become common law husband and wife during the 1870's, testified to by Simon Gillam who did not come to Mississippi until about ''six years after the Civil War,'' or, as he otherwise expressed it, until during ''President Grant's Administration'' as aforesaid. Moreover, if Simon was 85 years of age at the time of the trial, as he testified he was, when he gave the date of his birth as February 4, 1854, and if he came to this State when he was 21 years of age, he arrived in 1875. He says then that ''Patsy'' died after he came here, and that her husband, William Polk, Sr., thereafter began living with the woman ''Louise,'' as his wife; that Lizzie Polk was then born of that union. However, he further stated that he and Lizzie Polk taught school in the county together and that he tried to court her—''such courtin as it was''—and that the period covered by his teaching was from 1880 to 1887. In other words, Simon's version of the intestate's date of birth or genealogy cannot be harmonized with the established fact that she was at the time of her death approximately 78 years of age and was therefore born about the year 1860; neither can the fact that Eck Polk, the intervenor herein, was born, according to his own testimony, in 1877, be reconciled with the theory that his grandparents were not married until about six years after the Civil War, nor can it be true that Simon taught him as a pupil at school at some time between 1880 to 1887, if his grandparents did not begin living together as husband and wife until during ''President Grant's Administration.'' The conclusion is inescapable that the William Polk, Jr., and his alleged half-sister Lizzie Polk, of whom Simon testified, and those

by that name mentioned by the other witnesses were different persons, or that he was badly confused in his recital of chronological events. The proof on behalf of the intervenors does sustain the view, however, that their father, William Polk, Jr., and the intestate Lizzie Polk recognized that the relationship between themselves was that of half-brother and sister, and all of the evidence of any probative value in the case clearly establishes that they were both born in slavery time.

Having been born of a slave marriage, or rather of a relationship assumed by his parents during the period of slavery, the burden of proof was on the intervenors to show that William Polk, Sr., and the woman ''Patsy'' were living together as husband and wife in 1865 or in 1869, in order for the said William Polk, Jr., to have become legitimatized by the Act of 1865 or by the Constitution of 1869. It was not sufficient that they had lived and cohabited together prior to those times, but they had to be living together as husband and wife at the time the statute was passed or the Constitution adopted. This was likewise true as to William Polk, Sr., and the woman ''Louise,'' the alleged parents of the intestate, Lizzie Polk. The lack of such proof in this record leads inevitably to the legal conclusion that both of the offspring remained illegitimate.

Assuming that William Polk, Jr., and Lizzie Polk were in fact half-brother and sister, as found by the chancellor, on account of their having the same father, we find that Section 1408 of the Code of 1930 provides, among other things, that: ''the children of illegitimates . . . shall inherit from the brothers and sisters of their father or mother, whether legitimate or illegitimate . . . '' Under this provision of the statute, the intervenors, as children of William Polk, Jr., an illegitimate, are entitled to inherit from the sister of their father, whether legitimate or illegitimate, that is to say, they are entitled to inherit from Lizzie Polk as·half-sister of their father, for the reason that under Section 1403 of the Code of

1930, it is provided that: "There shall not be, in any case, a distinction between the kindred of the whole and half-blood, except that the kindred of the whole-blood, in equal degree, shall be preferred to the kindred of the half-blood in the same degree."

The effect of the provisions above quoted from Sections 1408 and 1403, respectively, of the Code of 1930, on the right of the appellees to inherit the property in question not having been emphasized in the original briefs, we have seen fit to call for additional briefs in order to afford the litigants an opportunity to be heard, before placing the decision of the case on that ground, and in so doing we were influenced by the consideration that this property would otherwise escheat to the state, although an intestate is presumed to have left heirs capable of inheriting, State v. Williams, 99 Miss. 293, 54 So. 951, Ann. Cas. 1913E, 381.

The appellant, Mattie Malone, whose maiden name was Mattie Johnson, claims that she was born of a marriage between Ray Johnson and Marinda Johnson and that her father, Ray Johnson, was also the father of the intestate, Lizzie Polk, but that he was not married to Lizzie Polk's mother—a condition of alleged kinship which even if found by the chancellor to exist would not entitle Mattie Malone to inherit property from Lizzie Polk under any of the provisions of Section 1408 of the Code of 1930, which reads as follows: "If any man beget a child or children by a woman whom he shall afterward marry, such child or children, if acknowledged by the man, shall, in virtue of such marriage and acknowledgment, be legitimate, and capable in law to inherit and transmit inheritance as if born in wedlock. All illegitimates shall inherit from their mother, and from her other children, and from her kindred, according to the statutes of descent and distribution; and the children of illegitimates and their descendants shall inherit from the brothers and sisters of their father or mother, whether legitimate or illegitimate, and from their grandparents. But the children of illegiti-

mates shall not inherit from any ancestor or collateral kindred if there be legitimate heirs of such ancestor or collateral kindred, in the same degree, to whom the estate would otherwise descend. And the mother of an illegitimate, her other children, and her kindred, whether they be legitimate or illegitimate, shall inherit from an illegitimate according to the statutes of descent and distribution.''

While it is true that the proof does not appear to be entirely satisfactory to clearly establish that William Polk, Jr., the father of the intervenors, appellees here, was the half-brother of the intestate, Lizzie Polk, if we look alone to the testimony of Simon Gillam hereinbefore discussed yet we are unable to say that the chancellor was manifestly wrong in finding that they had the same father, when the proof in that behalf is considered in connection with the testimony of other witnesses to the effect that each of them recognized their relationship as being that of half-brother and sister. And even though the chancellor was in error in finding that they were both born of common law marriages, assumed after the adoption of the Constitution of 1869, his decree would nevertheless be correct in holding that the appellees were entitled to inherit the property of the intestate, Lizzie Polk, deceased, since the appellees were shown to be the legitimate children of William Polk, Jr., an illegitimate, and hence entitled to inherit from the sister of their father, whether she was legitimate or illegitimate.

The first provision of the above quoted Section 1408 of the Code of 1930 is found under Article 3 from the Act of Wills, Hutchinson's Mississippi Code of 1821. The rigor of the common law which deemed an illegitimate to have no kindred was further modified by Article 115, chapter 60, of the Code of 1857 when the second provision now appearing in Section 1408 of the Code of 1930 was enacted. Again, the law of inheritance in that regard was made more liberal by Section 1955 of the Revised Code of 1871 when the next two provisions of said Section 1408,

supra, were enacted, and still further by Chapter 162 of the Laws of 1924 so as to embody the last provision found in the said Section 1408 of the said Code of 1930.

In Edwards v. Gaulding, 38 Miss. 118, which is cited in Alabama & Vicksburg Railway Co. v. Williams, 78 Miss. 209, 28 So. 853, 51 L. R. A. 836, 84 Am. St. Rep. 624, the Court held that even the legitimate children of an illegitimate, dying before the statute of 1857 was enacted, could not inherit from an illegitimate uncle or aunt dying after its passage. That decision, however, does not preclude the appellees in the case at bar from inheriting from the illegitimate sister of their father under the provisions of the statute which were added when the Code of 1871 was adopted, as aforesaid, for the reason that the proof in the present case clearly shows that William Polk, Jr., was living after 1871, because his son Eck Pope, was born during the year 1877.

It is true, as contended by the appellant, that Section 1408 of the Code of 1930 nowhere provides that an illegitimate may inherit from his father, but that fact is immaterial here for the reason that the appellees are the legitimate children of William Polk, Jr., and even though the said William Polk, Jr., be an illegitimate, the statute expressy provides that the children of such a person may inherit from the brothers or sisters of their father; and, although Lizzie Polk was only a half-sister of the illegitimate father of the appellees, they would be entitled to inherit from her under the provisions of Section 1403, Code of 1930, which provides for no distinction between the kindred of their father of the whole and half-blood, except that the kindred of the whole-blood, in equal degree, shall be preferred to the kindred of the half-blood in the same degree. In view of the fact that Lizzie Polk, deceased, has no kindred of the whole-blood, the appellees as children of her half-brother are entitled to inherit the property here in controversy.

While the proof also disclosed that the intestate Lizzie Polk, deceased, also recognized the appellant, Mattie

Malone, as being a half-sister, the chancellor rejected the proof as to the fact of such kinship and found under the conflict in the evidence that the intestate and the appellant had neither the same father nor the same mother, and that they were no kin at all.

The decree of the court below must therefore be affirmed.

Affirmed.